

Clarence T. Kipps, Jr., Miller & Chevalier, Chartered, of Washington, D.C., argued for appellant. With him on the brief were John Lloyd Rice and Scott E. Pickens. Also on the brief was Richard J. Marchek, Unisys Corp., of counsel.

Frank B. Flink, Jr., Commercial Litigation Branch, Dept. of Justice, of Washington, D.C., argued for appellee. With him on the brief were Stuart E. Schiffer, Acting Asst. Atty. Gen., David M. Cohen, Director and Thomas W. Petersen, Asst. Director. Also on the brief was Martha A. Klein, Sr. Trial Atty., Office of Gen. Counsel, U.S. Navy, of counsel.

**UNISYS CORPORATION, Appellant,**

v.

**UNITED STATES, Appellee.**

**89–1314.**

United States Court of Appeals, Federal Circuit.

Nov. 7, 1989.

Suggestion for Rehearing In Banc Declined Jan. 25, 1990.

Before MARKEY, Chief Judge, FRIEDMAN, Senior Circuit Judge,[*] and NIES, Circuit Judge.

FRIEDMAN, Senior Circuit Judge.

The issue in this case is the amount of a downward contract price adjustment to which the government is entitled because of concededly defective price information that the appellant Unisys Corporation sub-

* Judge Friedman took senior status on November 1, 1989.

mitted to the government during contract negotiations. The Armed Services Board of Contract Appeals (Board) held that the government is entitled to $746,737. *Sperry Corp. Computer Sys., Defense Sys. Div.,* ASBCA No. 29525, 88–3 B.C.A. ¶ 20,975, at 105,976. Unisys contends that the amount should be $153,079. We affirm the Board.

## I

A. The Truth in Negotiations Act (Act) requires that "[a] prime contractor or any subcontractor shall be required to submit cost or pricing data under [certain enumerated circumstances], and shall be required to certify that, to the best of his knowledge and belief, the cost or pricing data he submitted was accurate, complete and current...." 10 U.S.C. § 2306(f)(1) (1982). The Act also provides that "[a]ny prime contract ... under which such certificate is required shall contain a provision that the price to the Government, including profit or fee, shall be adjusted to exclude any significant sums ... [by which] such price was increased because the contractor ... furnished cost or pricing data which, as of a date agreed upon between the parties ... was inaccurate, incomplete, or noncurrent...." 10 U.S.C. § 2306(f)(2) (1982).

The relevant Defense Acquisition Regulation (Regulation) in effect at the time of the contract here at issue provided:

If such certified cost or pricing data are subsequently found to have been inaccurate, incomplete or noncurrent as of the effective date of the certificate, the Government is entitled to an adjustment of the negotiated price, including profit or fee, to exclude any significant sum by which the price was increased because of the defective data.

Regulation § 3–807.10(a) (1978) *reprinted in* 32 C.F.R., Parts 1–39, Vol. I, at 486 (1981). This "adjustment" is known as a downward price adjustment.

The Regulation also described the appropriate method of calculating the amount by "which the price was increased because of the defective data":

(a) ... In arriving at a price adjustment under a clause, the contracting officer should, after review of the contract negotiation, consider the following:

(1) *The time when cost or pricing data was reasonably available to the contractor....*

(2) In the absence of evidence to the contrary, the natural and probable consequences of defective data is an increase in the contract price in the amount of the defect plus related burden and profit or fee; therefore, unless there is a clear indication that the defective data were not used, or were not relied upon, the contract price should be reduced in that amount. In establishing that the defective data caused an increase in the contract price, the contracting officer is not expected to reconstruct the negotiation by speculating as to what would have been the mental attitudes of the negotiating parties if the correct data had been submitted at the time of agreement on price.

(3) In determining the amount of an adjustment, the contracting officer shall consider any understated cost or pricing data submitted in support of price negotiations for the same pricing action ... up to the amount of the Government's claim for overstated cost or pricing data arising out of the same pricing action. Such offsets, however, need not be in the same cost groupings (*e.g.,* material, labor or overhead).

Regulation § 3–807.10(a) (1978) (emphasis in original) *reprinted in* 32 C.F.R., Parts 1–39, Vol. I, at 486–87 (1981).

To implement the Act, the government requires that every contract subject to the Act shall include a uniform clause entitled "Price Reduction for Defective Cost or Pricing Data," which tracks the language of the Act and the Regulation. Regulation § 7–104.29 (1976) *reprinted in* 32 C.F.R. Parts 1–39, Vol. II, at 133–34 (1981).

Although these provisions have been changed since the contract was executed, the parties apparently agree that the provisions in effect when the contract was exe-

cuted control. We therefore look to those provisions in deciding this case.

B. The dispute in this case involves the thirteenth in a series of contracts by which the Navy purchased similar computers and related test data from Sperry Corporation, now Unisys Corporation. Since Unisys was the developer and sole supplier of these special computers, the contracts were negotiated and not the result of competitive bidding.

The contract was the product of extensive negotiation. Unisys submitted its first pricing proposal in July 1980, followed by an updated price proposal in August. In November of that year, Unisys submitted a summary pricing proposal updating the August proposal to account for "changes in Manufacturing Labor factors, Labor Standards and Material Standards from the most recent baseline activity" as well as to correct errors and account for labor escalation changes.

In April and October of each year, Unisys compiled a semi-annual report of the cost and pricing data for the preceding six months. The original July 1980 proposal was based on data compiled up through April 1980. The November 1980 proposal by Unisys incorporated the October 1980 figures. Similarly, the memorandum attached to the government's Pre–Negotiation Clearance also incorporated the October 1980 data.

In January 1981, the government completed a Pre–Negotiation Clearance. A memorandum attached to this document contained the government's own estimate of the proper cost for the various items in the contract and was the basis upon which the government authorized its representative finally to agree upon the terms of the contract. When the government approved the Pre–Negotiation Clearance, the parties had agreed on all aspects of the contract except total price.

On February 10, 1981, the parties agreed on the total price. As the Board found, this "[a]greement was reached on the basis of total bottom line price, not on each element of cost." 88–3 B.C.A. at 105,978. Together with its letter of February 11 confirming the agreement regarding price, Unisys furnished the required Certificate of Current Cost or Pricing Data stating that the cost or pricing data supplied were "accurate, complete and current." The government negotiator then prepared a Post–Negotiation Clearance "to record the results of the negotiations ... [and] to request approval of those negotiations, and to request authority to enter into a contract." *Id.*

Throughout the negotiations, with minor exceptions the most recent cost or pricing data Unisys disclosed was that for the tenth lot of computers. Although data for Lot 11 became available before the final agreement on price was reached, Unisys did not provide the government with most of this information, even though the government negotiator had indicated his interest in the data. In a post-award audit, the government concluded that by failing to disclose Lot 11 cost or pricing information, Unisys had submitted defective cost or pricing data, and that Unisys' failure to disclose "resulted in an overstatement of the contract of $835,196." 88–3 B.C.A. at 105,979.

The Board agreed that Unisys had submitted defective cost or pricing information, but reduced the government's downward price adjustment to $746,737. In a lengthy opinion, the Board discussed in detail each of the four categories for which the data were defective.

It pointed out that the parties agreed, as they still do, on the amount to which the government was entitled for one of the categories. With respect to the other three categories, the Board ruled that the proper basis for determining the amount of the downward price adjustment was the difference between the price and cost data in the memorandum attached to the Pre–Negotiation Clearance prepared by the government and based on the data disclosed by Unisys up to the October 1980 pricing report, and the lower cost that would have been shown if Unisys had disclosed to the government, prior to the February 10, 1981 agreement on bottom line price, the information it had on the costs of producing Lot 11. The Lot

11 costs eventually were disclosed in the April 1981 pricing report after the agreement on bottom line price had been reached.

The Board held the figures the government used in its Pre–Negotiation Clearance, "to be the most accurate expression of the" pricing or cost data that Unisys had disclosed. The Board found that if the government negotiator had known of the nondisclosed data regarding Lot 11, he would have used that data in (1) preparing the Pre–Negotiation Clearance and (2) negotiating the contract price.

## II

Unisys contends that the Board improperly determined the amount of the government's downward price adjustment because it did not follow the requirement in the Regulation that the reduction in the contract price resulting from defective cost and price data should be "the amount of the defect." Regulation § 3–807.10(a)(2). According to Unisys, "[t]he amount of the defect is the amount of cost overstatement in the disclosed defective data." Unisys asserts that based upon the Board's findings of fact, "[w]hen the disclosed and undisclosed costs are compared, the disclosed costs were overstated in the total amount of $153,079, inclusive of overhead and profit."

Unisys relies on the provision in the Regulation that "[i]n the absence of evidence to the contrary, the natural and probable consequences of defective data is an increase in the contract price in the amount of the defect plus related burden and profit or fee...." Regulation § 3–807.10(a)(2). Unisys argues that the Board's calculation should have been based upon the data disclosed in its semiannual October 1980 pricing report, which in turn reflects the costs or prices for Lot 10.

The proper analysis, however, is not as simple as Unisys would like to have it. Unisys' comparison of the April 1981 figures and the October 1980 figures might be appropriate in a case where the contractor failed to disclose its correct cost for a single item and the parties used only the most recent figures to calculate the cost.

The present case, however, is one in which the price calculations were complicated, and the parties in negotiating relied upon a congeries of data. For example, as the Board noted "[w]ith respect to printed circuit fabrication, core memory fabrication, and core memory assembly, appellant [in its November 1980 proposal] used averages of the data for the one year period of August 1, 1979 to July 31, 1980." 88–3 B.C.A. at 105,979. Similarly, the government used its own form of averaged rates. *See, e.g., id.* at 105,980. Moreover, here the dispute over the cost and pricing data involved mainly complicated issues about the labor requirements for performing various parts of the contract, and not merely the cost of specific components.

Accordingly, the Board found that the figures shown in the memorandum attached to the government's Pre–Negotiation Clearance represented "the fairest and most reasonable reflection of the price agreed upon" by the government and Unisys. 88–3 B.C.A. at 105,986.

In view of the purpose of the Act, we conclude that the comparison between the figures from the undisclosed data relating to Lot 11 and the figures upon which the government actually relied in formulating its Pre–Negotiation Clearance and negotiating the contract price, was a proper basis for determining "the amount of the defect" resulting from Unisys' failure to disclose, before the parties agreed on price, the data relating to Lot 11.

In enacting the Truth in Negotiations Act, Congress recognized that in a noncompetitive atmosphere, contractors had little motivation to base their prices on the lowest possible costs. *Hardie–Tynes Mfg. Co.,* ASBCA No. 20367, 76–1 B.C.A. ¶ 11,827, at 56,475, 56,480. The Act was designed to prevent and avoid "situations in which inaccurate, incomplete, or noncurrent information is known by the contractor, but withheld from the Government to its detriment." *Sylvania Elec. Prods., Inc. v. United States,* 479 F.2d 1342, 1346, 202 Ct.Cl. 16 (1973). Contractors such as Uni-

sys therefore are required to "certify, to the best of their knowledge and belief, that the 'cost or pricing data [they] submitted [to the government] [were] accurate, complete and current.'" *Universal Restoration, Inc. v. United States,* 798 F.2d 1400, 1402 (Fed.Cir.1986) (brackets in original). When a contractor has breached its duty to disclose such data, as Unisys concededly has done here, the government is entitled to a downward price adjustment in the amount of the overstated costs. *See M–R–S Mfg. Co. v. United States,* 492 F.2d 835, 203 Ct.Cl. 551 (1974).

In the present case, as the Board found and Unisys concedes, Unisys' failure to disclose the data relating to Lot 11 prior to the parties' agreement on price was a failure to submit the "accurate, complete and current" cost and pricing data that the Act required. The Board also found that if the nondisclosed data had been given to the government negotiator, the latter would have utilized them in formulating the prices in the Pre–Negotiation Clearance documents, on the basis of which the government negotiated the contract price. Unisys apparently does not challenge that finding, and in any event, we accept it because it is supported by substantial evidence.

In *Sylvania Electric Products,* the court indicated that one of the elements that established the government's entitlement to a downward price adjustment pursuant to the contract's defective pricing clause, was "that the Government relied upon the inaccurate data thus establishing a causal relationship between the incorrect data and the final negotiated contract price...." 479 F.2d at 1349. Thus, the critical comparison in determining the amount of the downward price adjustment is between the lower cost figures that the contractor failed to disclose and the higher figures upon which the government relied in agreeing to the contract price. As the Board in this case observed, the higher figures would be "the fairest and most reasonable reflection of the price agreed upon" by the government and the contractor. 88–3 B.C.A. at 105,986.

There is no dispute that the figures Unisys should have disclosed were the data relating to the lower costs for Lot 11. Unisys actually disclosed this information to the government in April 1981, two months after the parties had agreed on the total price. The Board found, the record shows, and Unisys does not deny, that that information was available to it and therefore could have and should have been disclosed to the government before the agreement on total price was reached on February 10, 1981.

The question, therefore, is what cost and price information the nondisclosed information should be compared to, to determine the injury the government suffered from the nondisclosure. Unisys argues that the proper comparison is with the figures it gave the government in its October 1980 pricing report. The Board held that the correct comparison is with the figures on which the government relied in formulating its January Pre–Negotiation Clearance, since those were the figures upon which the government negotiated the contractual price.

We agree with the Board because, in the language of the Regulation, this comparison produces an amount that most accurately will exclude "any significant sum by which the price was increased because of the defective data." Regulation § 3–807.10(a). It is, we believe, the most accurate basis for determining the amount by which the nondisclosure injured the government.

The Regulation precludes any attempt "to reconstruct the negotiation by speculating as to what would have been the mental attitudes of the negotiating parties if the correct data had been submitted at the time of agreement on price." *See* Regulation § 3–807.10(a)(2). *See also American Bosch Arma Corp.,* ASBCA No. 10305, 65–2 B.C.A. ¶ 5280, at 24,849, 24,852–53. The Board's analysis, however, did not involve any prohibited speculative attempt to reconstruct what the effect of disclosure of the Lot 11 data would have been on the government's negotiating position or what change in the contract price such disclosure

might have produced. Here the inquiry was only into the amount of the defect resulting from Unisys' nondisclosure of relevant significant cost and pricing information. The Board did not attempt to determine the effect of the nondisclosure.

Inevitably, as the Board noted in *Hardie-Tynes*, "[s]peculation and hypothesis are unavoidable in cases of this nature...." 76–1 B.C.A. at 56,481. The inherently and necessarily speculative character of the Board's inquiry in this case, however, is not the kind of speculative reconstruction of the negotiations that the Regulation prohibits.

Considering all the circumstances, we cannot say that the Board abused its discretion or committed any legal error in basing its determination of the government's downward pricing adjustment on a comparison of the data regarding Lot 11 that Unisys should have submitted and the data upon which the government relied in negotiating the contract price as stated in the memorandum attached to its Pre-Negotiation Clearance.

## CONCLUSION

The decision of the Armed Services Board of Contract Appeals is

AFFIRMED.