AEROJET SOLID PROPULSION
COMPANY, Appellant,

v.

Thomas E. WHITE, Secretary
of the Army, Appellee.

No. 01–1140.

United States Court of Appeals,
Federal Circuit.

May 29, 2002.

Terry L. Albertson, Crowell & Moring LLP, of Washington, DC, argued for appellant.

Gerald M. Alexander, Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for appellee. With him on the brief were Stuart E. Schiffer, Acting Assistant Attorney General; David M. Cohen, Director; and Todd M. Hughes, Assistant Director.

Before MICHEL, RADER, and BRYSON Circuit Judges.

Opinion for the court filed by Circuit Judge RADER. Dissenting opinion filed by Circuit Judge BRYSON.

RADER, Circuit Judge.

The Armed Services Board of Contract Appeals (Board) held that the Truth in Negotiations Act (TINA), 10 U.S.C. § 2306a (1988), required Aerojet Solid Propulsion Company (Aerojet) to disclose its receipt of additional sealed bids to the United States during contract price negotiations. *Aerojet Solid Propulsion Co.,* ASBCA Nos. 44568 and 46057, 00–1 B.C.A. ¶ 30,855 (2000). Because knowledge of the undisclosed bids clearly was information a prudent buyer or seller reasonably would expect to affect price negotiations significantly, this court affirms.

## I.

In early 1989, Aerojet was the sole supplier of nitroplasticizer to the United States. Nitroplasticizer is an ingredient in plastic bonded explosives and in ordnance propellants. In May 1989, the United States issued a request for quotations (RFQ) to acquire bids for a five-year contract for nitroplasticizer. Aerojet submitted an initial quotation for the nitroplasticizer on June 19, 1989. In July 1989, the Army awarded Aerojet the contract for the supply of 394,669 pounds of nitroplasticizer. The letter contract directed Aerojet to begin performance with the final price term of the contract to be determined through subsequent negotiations.

As part of those price negotiations, the contract required Aerojet to provide the United States with cost and pricing information regarding the materials of the contract. Thus, Aerojet gave the United States "price in effect" * quotes for the various chemical constituents of nitroplasticizer. Nitroethane is the principal chemical constituent of nitroplasticizer and is the focus of this dispute. During the time at issue, the price of chemicals fluctuated violently. From February 1989, before issuance of the RFQ, through the end of price negotiations in June 1990, Aerojet solicited and received multiple sealed bids for nitroethane from suppliers Angus Chemical Company (Angus) and W.R. Grace Company (Grace). After receiving those bids, Aerojet presented a nitroethane cost of $1.98/lb in its proposals to the United States. The parties used that cost to negotiate a final contract price of $18,462,235. Although the letter contract envisioned finishing negotiations by December 31, 1989, the parties did not agree on the final contract price until June 20, 1990. On that same day, Aerojet executed a certificate of current cost or pricing data.

Unbeknownst to the United States, Aerojet solicited and received additional sealed bids for nitroethane from Angus and Grace during the final period of the negotiations. Aerojet had established a policy subject to Air Force review and approval that sealed bids were to remain unopened until after the bid deadline to prevent fraud or collusion in the procurement process. Aerojet set the bid deadline as June 20, 1990. In this case, the parties concluded their separate and unrelated price negotiations on the same day as the bid deadline. In compliance with that policy, Aerojet did not open the sealed bids of Angus and Grace until June 21, 1990, the day after the bid deadline and the simultaneous conclusion of price negotiations. When opened, the Angus bid quoted nitroethane at $1.45/lb; the Grace bid was $1.47/lb.

Aerojet's nitroplasticizer contract incorporated a term from 48 C.F.R. § 52.215–22 (1988) that allowed the United States to reduce the contract price if Aerojet had "furnished cost or pricing data that were not complete, accurate, and current as certified." On October 22, 1991, the Defense

_____
* A "price in effect" quote does not bind the bidder to that price at a later time but represents merely the current price of the quoted good or service.

Contract Audit Agency issued a post-award audit report in which it determined that Aerojet provided defective cost and pricing data by not revealing that it had solicited and received additional bids for nitroethane. As a result, the United States required Aerojet to remit $483,813 of the contract price, plus interest. This sum compensated the United States for the additional contract cost beyond the $1.45/lb nitroethane bid price. Aerojet complied by refunding $513,842 that accounted for interest, and, in turn, submitted against the United States its current claim for that amount plus interest. The premise of Aerojet's claim is that the additional bids did not constitute cost or pricing information subject to disclosure.

The contracting officer denied Aerojet's claim. Aerojet appealed to the Board. The Board affirmed the decision of the contracting officer because the new bids were relevant "cost or pricing data." Aerojet appeals the Board's decision. This court has jurisdiction under 41 U.S.C. § 607(g)(1)(A) (1994).

### II.

■ This court reviews without deference the Board's conclusions of law. *Rex Sys. v. Cohen,* 224 F.3d 1367, 1371 (Fed. Cir.2000); *Cessna Aircraft Co. v. Dalton,* 126 F.3d 1442, 1446 (Fed.Cir.1997). Nevertheless, legal interpretations by expert tribunals are helpful, even if not compelling. *US West Communications Servs., Inc. v. United States,* 940 F.2d 622, 625 (Fed.Cir.1991). This court affirms the Board's factual findings unless they are "fraudulent, or arbitrary, or capricious, or so grossly erroneous as to necessarily imply bad faith, or if such decision is not supported by substantial evidence." 41 U.S.C. § 609(b) (1994).

■ A primary objective of TINA is to place government and private contractors in roughly equal positions during con-tract negotiations. *Unisys Corp. v. United States,* 888 F.2d 841, 844 (Fed.Cir.1989). TINA states: "(1) The head of an agency shall require ... contractors ... to make *cost or pricing data* available [to the United States] ... before the award of a contract...." 10 U.S.C. § 2306a(a)(1)(A) (1988) (emphasis added). TINA prevents contractors from withholding cost or pricing information from the government. *Unisys,* 888 F.2d at 844 (quoting *Sylvania Elec. Prods., Inc. v. United States,* 202 Ct.Cl. 16, 479 F.2d 1342, 1346 (1973)).

To implement TINA, the government requires that every contract subject to TINA include a provision entitled "Price Reduction for Defective Cost or Pricing Data." 10 U.S.C. § 2306a(e)(1)(A). This provision tracks the language of TINA and allows the United States to reduce the contract price when defective cost or pricing data submitted by the contractor has increased the contract price. *Id.*

Since 1986, TINA has included an express definition of "cost and pricing data":

The term *"cost or pricing data"* means *all facts* that, as of the date of agreement on the price of a contract (or the price of a contract modification), or, if applicable consistent with [other terms in TINA], a *prudent buyer or seller* would *reasonably expect* to affect price negotiations *significantly.* Such term *does not include information that is judgmental,* but does include the factual information from which a judgment was derived.

10 U.S.C. § 2306a(h)(1) (emphases added). The implementing Federal Acquisition Regulation also provides:

Cost or pricing data are more than historical accounting data; they are all the facts that can be reasonably expected to contribute to the soundness of estimates of future costs and to the validity of determinations of costs already incurred.

They also include such factors as (a) vendor quotations. . . .

48 C.F.R. § 15.801 (1989).

Although section 2306a(e)(2) provides that "it shall be a defense that the United States did not rely on the defective data submitted," Aerojet does not contest that the United States in fact did rely upon the allegedly defective cost data. Accordingly, this court need decide only whether the two undisclosed sealed bids constituted cost or pricing data that rendered defective the cost and pricing data Aerojet submitted to the United States.

### III.

■ With chemical prices fluctuating wildly, a reasonable buyer or seller would recognize that mere knowledge of the undisclosed sealed nitroéthane bids might give one negotiator an advantage during contract price negotiations. Hence, the Board did not err in determining that Aerojet's duty to disclose cost or pricing data required disclosure of the existence of the sealed nitroethane bids and the opening date of such bids.

More specifically, because the contract at issue is a fixed price contract, Aerojet bore a risk that actual cost of performance would exceed the final contract price, while the United States bore an opposite but corresponding risk. The final price negotiations ensued in the context of a volatile chemical market, to which nitroethane also was subject. Nitroethane is the key and most expensive material used to produce the nitroplasticizer, accounting for about 15% of its total cost. Hence, any significant variation in the cost of nitroethane significantly affects the cost of nitroplasticizer. The market volatility exposed both parties to increased price risk. The mere existence of more recent nitroethane bids due to be opened imminently would potentially alter the expectations during the May 2 to June 20 negotiations.

In a nutshell, Aerojet solicited and received new nitroethane bids from Angus and Grace that it did not disclose to the United States. Aerojet and the United States may well have followed the chemical price trends. Aerojet knew it had more recent bids of which the United States was unaware. Even though the negotiation procedures prevented opening those bids until after close of negotiations, Aerojet may well have had expectations about the contents of those sealed bids. Based on those expectations, Aerojet may have sought more diligently to close negotiations before the scheduled opening of the sealed bids or may have sought to delay negotiations until after the scheduled opening. For example, if Aerojet expected (from examining market behavior) that the new bids for nitroethane would be for more than $1.98/lb, Aerojet may have sought to delay negotiations until after those bids were opened. Aerojet then could use that higher nitroethane price to negotiate from the United States a higher contract price. Likewise, Aerojet could act to hurry negotiations should it expect that the new bids would be for less than $1.98/lb. By hurrying negotiations to completion before the bid opening date, Aerojet could ensure that the United States would not come into possession of lower nitroethane cost data that the United States then could use to force a lower contract price. The Board clearly credited the government negotiators' testimony that they would have used lower cost data to negotiate a lower contract price. Hence, the mere knowledge of the existence of the sealed bids and the June 21 bid opening date may have supplied Aerojet with an advantage in the negotiation process. Any prudent buyer or seller would recognize the existence of the bids as significant to price negotiations. *Cf. Unisys*, 888 F.2d at 844; *Boeing Co.*, ASBCA No. 33881, 92–1 B.C.A. ¶ 24,414

(1991) (holding that "the fact that there was an outstanding bid on another contract which could have affected the ... contract price was data within the meaning set out in TINA" and rejecting the contractor's argument that speculative data need not be reported to the government during negotiations).

The dissent argues that receipt of the sealed bids cannot be cost or pricing data because Aerojet simply could have deferred solicitation of its bids until after execution of the contract—thus avoiding any disclosure obligation. That hypothetical is not before this court. Nevertheless, it is sufficient to note that TINA affirmatively obliges contractors such as Aerojet to provide the government with current and accurate cost data. 10 U.S.C. § 2306a; *Unisys*, 888 F.2d at 844. In this case, as required by the contract under TINA, Aerojet certified that the cost or pricing data it provided were complete, accurate, and current. Hence, any unilateral decision by Aerojet to not solicit updated cost data until after final price negotiations would be contrary to Aerojet's certification under TINA that the cost data were complete accurate and current.

Aerojet protests that its contract negotiators themselves did not know that the sealed bids had been received. This court finds Aerojet's protest unavailing, nevertheless, because it is irrelevant. Cost or pricing data simply is not any less cost and pricing data because it has been selectively disseminated or not actually used. Aerojet's obligation to disclose the sealed nitroethane bids "cannot be reduced ... by the lack of administrative effort to see that all significant data are gathered and furnished the government, or by the subjective lack of knowledge of such data on the part of [Aerojet's] negotiators." *McDonnell Aircraft Co.*, ASBCA No. 44504, 97–1 B.C.A. ¶ 28,977 at 144,316 (1997). Also, the Board found that "Aerojet's negoti-

ator's could have easily determined the number of bids and the identity of the bidders prior to the agreement on price." *Aerojet Solid Propulsion Co.*, ASBCA Nos. 44568 and 46057, 00–1 B.C.A. ¶ 30,855. In view of the above and the high deference that this court affords the Board's findings of fact, the Board did not err in holding that Aerojet improperly withheld knowledge of the existence of the new though unopened bids from the United States.

## CONCLUSION

In sum, receipt of the new sealed nitroethane bids clearly was information a prudent buyer or seller reasonably would expect to affect price negotiations significantly. Therefore, Aerojet had an obligation to disclose their receipt under the plain language of 10 U.S.C. § 2306a. The decision of the Armed Services Board of Contract Appeals therefore is affirmed.

## COSTS

Each party shall bear its own costs.

*AFFIRMED.*

BRYSON, Circuit Judge, dissenting.

I respectfully dissent. In my view, the information that Aerojet failed to provide to the government did not constitute "cost or pricing data" and therefore did not fall within the purview of the Truth in Negotiations Act ("TINA"), 10 U.S.C. § 2306a.

It is important to note what is *not* in dispute in this case. First, the Board of Contract Appeals held that Aerojet was not aware of the contents of the nitroethane bids in its locked bid box, and the government does not challenge that finding. Second, the Board held that it was entirely lawful for Aerojet to keep the nitroethane bids sealed until after the negotiations with the Air Force were com-

plete, and the government does not now challenge that legal conclusion. Third, the Board found that the government "has not pointed to any evidence showing that Aerojet manipulated [its sealed bid procedures] to avoid its disclosure obligations under TINA," and the government has not pointed to any basis for reaching a contrary conclusion. Finally, the parties agree that the bids on nitroethane were "price in effect" bids, i.e., the price quoted in the bids was not binding on the bidding party, but merely indicative of the current price of the commodity, which would be subject to further change depending on fluctuations in the market price.

In light of these undisputed facts, it is hard to fathom why the mere fact that Aerojet had sought and obtained bids for nitroethane should be regarded as "cost or pricing data" within the meaning of TINA. The government witnesses who testified before the Board said that the government relied on price quotations from August 1989 and would have negotiated a lower price for the contract if it had known that Aerojet had lower quotations for nitroethane. Significantly, however, they did not testify that the government would have changed its position if it had known that Aerojet had unopened bids for nitroethane at a price unknown to either Aerojet or the government. Their testimony that they would have used lower cost data to negotiate a lower contract price, on which the majority relies, is therefore entirely irrelevant, as the disclosure at issue in this case was not a disclosure of lower cost data. Moreover, the government was aware that Aerojet would be soliciting bids for nitroethane during the weeks before it would be needed. As the Board noted, the parties stipulated that the August 1989 price proposal stated that purchase orders for nitroethane would be solicited eight to ten weeks before the chemical was needed, and government witnesses testified that

they knew that price quotations would be obtained during that period.

Because Aerojet did not know what the bids were, it did not have superior knowledge to the government in that regard. Moreover, because the bids were "price in effect" bids, the price set forth in the bid documents would not have been binding in any event. The government's evidence thus does not support a finding that knowledge of the mere existence of the bids would have had a significant effect on price negotiations. 10 U.S.C. § 2306a(h)(1).

Neither the Board of Contract Appeals nor the court today points to evidence supporting the government's contention that the mere existence of the unopened bids was the sort of information that "a prudent buyer or seller would reasonably expect to affect price negotiations significantly." 10 U.S.C. § 2306a(h)(1). The majority states that in light of the volatility of the market for nitroethane, "[t]he mere existence of more recent nitroethane bids would potentially alter the expectations during negotiations." With respect, I do not follow the majority's reasoning. The majority acknowledges that "Aerojet and the United States may well have followed the chemical price trends," and the Board made no finding that the government was unaware of the volatility of the market for nitroethane. Assuming that both parties knew that the price for nitroethane changed over time and that the price Aerojet would have to pay might well change from the price quoted in August 1989, it is hard to understand why the government would be disadvantaged by not knowing that during the course of negotiations Aerojet had obtained bids for nitroethane at a price unknown to either Aerojet or the government.

The majority asserts that Aerojet "may well have had expectations about the contents of [the] sealed bids" and that

"[b]ased on those expectations, Aerojet may have sought more diligently to close negotiations before the scheduled opening of the sealed bids or may have sought to delay negotiations until after the scheduled opening." But this is pure speculation. The Board made no finding that Aerojet had any expectations as to the likely bid price, and the Board explicitly noted that the government had not offered any evidence that Aerojet had manipulated the sealed bid procedure to avoid its disclosure obligations.

How would Aerojet's position be any different if, rather than soliciting bids for nitroethane during negotiations with the government, it had decided during the course of negotiations to postpone soliciting nitroethane bids until immediately after concluding those negotiations? Surely Aerojet's intention to obtain new price information after the contract was formed would not be "cost or pricing data" within the meaning of TINA. If that is so, I am at a loss to understand why the fact that Aerojet solicited bids during negotiations that were not opened until after formation of the contract is any different.