ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeals of - | ) |
| | ) |
| AAI Corporation, d/b/a Textron Systems, Unmanned Systems | ) ASBCA Nos. 61195, 61356 |
| | ) |
| Under Contract No. W31P4Q-06-C-0292 | ) |

APPEARANCES FOR THE APPELLANT:    Frederic M. Levy, Esq.
                                  Nooree Lee, Esq.
                                    Covington & Burling LLP
                                    Washington, DC

APPEARANCES FOR THE GOVERNMENT:    Scott N. Flesch, Esq.
                                    Army Chief Trial Attorney
                                   MAJ Michael R. Tregle, Jr., JA
                                    Trial Attorney

OPINION BY ADMINISTRATIVE JUDGE O'CONNELL
ON CROSS MOTIONS FOR SUMMARY JUDGMENT

Appellant, AAI Corporation d/b/a Textron Systems, Unmanned Systems (Textron), moves for summary judgment, contending that the government's claim is barred by the statute of limitations; it also contends that it is entitled to summary judgment on the merits of two of the three principal elements of the claim. The Board grants Textron's motion with respect to the duplication of shelter costs, otherwise it is denied.

STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTION

The following facts are undisputed or uncontroverted.

1. Textron is the manufacturer of a Tactical Unmanned Aircraft Vehicle (TUAV) system. It has furnished TUAV systems to the Army since 1999, starting with a low-rate initial production contract followed by a series of full-rate production (FRP) contracts. Those contracts are referred to as the FRP I, FRP II, FRP III, and FRP III Supplemental, while the contract at issue is the FRP IV. (Appellant's Statement of Undisputed Material Facts (ASUMF) ¶¶ 1, 3)

2. On January 11, 2006, the Army requested that Textron submit an FRP IV proposal for 11 TUAV systems by January 31, 2006. Subsequent amendments

requested alternate pricing for 10 and 9 systems. Textron submitted a timely proposal. (ASUMF ¶¶ 9-14)

3. Textron's proposal stated that due to the time constraints it based its labor and material costs on the FRP III Supplemental contract, which it had been awarded seven months earlier (ASUMF ¶¶ 15-17). Its FRP IV proposal stated that it had applied a 91.66% adjustment factor to account for the reduction in the number of systems from 12 in the FRP III Supplemental contract to 11 in FRP IV, and additional adjustment factors for 10 and 9 systems. Textron refers to this as its "parametric" approach. (ASUMF ¶ 17) After applying the adjustment factor, Textron then increased its prices to account for cost escalation (ASUMF ¶ 25; reply at 5, n.6; gov't additional statements of undisputed material facts (GASUMF) ¶ 19; app. supp. R4, tab 25 at 2).

4. The Defense Contract Audit Agency (DCAA) conducted an examination of Textron's proposal, after which it concluded that "the cost or pricing data submitted by the offeror in support of the direct material costs, direct labor rates, and indirect rates are adequate." (ASUMF ¶ 21; R4, tab 12 at Doc 22.1 at 3[1])

5. The parties entered into negotiations and on April 28, 2006, Textron provided the government a Certificate of Current Cost or Pricing (R4, tab 2). On May 4, 2006, the parties signed a contract for nine systems for a total price of $87,154,533 (R4, tab 1). The contract incorporated various clauses, including Federal Acquisition Regulation (FAR) 52.215-2, AUDIT AND RECORDS – NEGOTIATION (JUN 1999) and FAR 52.215-10, PRICE REDUCTION FOR DEFECTIVE COST OR PRICING DATA (OCT 1997) (*id.* at 74).

6. As relevant to these appeals, the contract required Textron to deliver a sensor suite payload (the "POP 300 Payload"), and to provide shelters for ground control and maintenance section multifunctional components (ASUMF ¶ 4).

7. Nearly 11 years later, on March 8, 2017, contracting officer (CO) Gregory Wilson issued a final decision in which he determined that the government was entitled to a price adjustment of $7,190,376, plus interest, based on his conclusion that Textron had provided the government defective pricing[2] (R4, tab 18). The CO based the final decision in large part upon a DCAA audit report dated January 8, 2014 (*id.* at 1).

_____

[1] Rule 4 citations are to the page number of the .pdf file.
[2] As will be discussed in far greater detail below, under the Truth in Negotiations Act (TINA), the government is entitled to adjust a contract price if it was affected by defective pricing data provided by the contractor. 10 U.S.C. § 2306a(e).

8. The following three discrete parts of the claim are relevant to the pending motions[3]:

*POP 300 Payload - $679,500*

9. In its proposal, Textron listed a base price of $162,683 per unit (from the FRP III Supplemental contract) for the POP 300 Payload (ASUMF ¶¶ 16, 19; government disputed material facts (GDMF) ¶ 19; R4, tab 12 at Doc. 27 at 39). The government contends that after Textron applied its parametric approach and escalation, its actual proposed price was $181,558 (GDMF ¶ 19). DCAA calculated the $181,558 figure through an analysis of various tasks in Textron's proposal (R4, tab 18 at 21).

10. In response to a proposed government undisputed fact that quotes the DCAA analysis at length, Textron does not deny the accuracy of DCAA's analysis/calculations but rather states that it is "not relevant" and "a legal conclusion" (app. resp. to gov't add. statements of undisputed material facts ¶ 51; *see* app. reply at 5, n.6 ("the fact that Textron applied escalation factors to the $162,683 amount was itself disclosed in the proposal")). To the extent that this is a denial, the Board views it as conclusory.

11. It is undisputed that in April 2006, Textron had agreed upon a price of $165,855 with a subcontractor prior to signing the certificate of cost or pricing. It is also undisputed that Textron failed to inform the government of this price. (ASUMF ¶¶ 19, 33; GDMF ¶ 19; GASUMF ¶¶ 42, 45-46, 50-51; app. resp. to GASUMF ¶¶ 42, 45- 46, 50-51). The government contends that the statute of limitations began to run in 2013 when Textron produced to DCAA documents concerning the $165,855 price (gov't supp. br. at 6; GDMF ¶ 50).

12. The government's claim is based on the difference between the $181,558 proposed price and the purchase order price of $165,855, multiplied by 36 units[4] (GDMF ¶ 19; GASUMF ¶ 51).

*Duplication in Shelter Costs - $415,800*

13. The parties agree that the document at R4, tab 12, doc. 27 is Textron's final FRP IV proposal and that it was submitted on April 19, 2006 (ASUMF ¶ 19, n.1; gov't

---

[3] As will be seen, the three issues add up to less than the $7,190,376 claim amount. The additional amounts the government seeks derive from these three issues, including more than $1.5 million in general and administrative costs (R4, tab 18 at 6).

[4] This is our understanding of the government's current claim calculation (*see* GDMF ¶ 19). It would reduce the amount of the claim to about $565,308.

resp. at 4, n.1). This is a 149-page document with each page labelled at the top "Bid Cost Worksheet Report."

14. Pages 10-11 of the document include costs for Task 114, Ground Control Shelters. Pages 53-54 includes costs for Task 1E2E, Maintenance Section Multifunctional Shelters. (ASUMF ¶20)

15. Page 147 contains costs for Task Z7, which is described as "Additional cost for Shelters" (*id.*). Under the heading "Basis of Estimate" it states "[a]dd the delta cost between what was proposed and the actual cost of the GCS and MSM shelters." It goes on to represent that Textron had proposed a price of $75,651 for the GCS shelters but its actual price had been $89,522, resulting in a shortfall of $13,871 x 18 units = $249,678. It made comparable representations for the MSM shelters, resulting in a total additional cost of $415,800. (R4, tab 12, doc. 27 at 147)

16. In the final decision, the CO, relying on the DCAA audit report, concluded that all of these costs were duplicates of the GCS and MSM costs on pages 10-11 and 53-54 of the proposal (R4, tab 18 at 5). To determine that the costs for the GCS shelters were duplicated, DCAA divided the "Subcontracts 2" price of $1,911,077 on page 11 of the proposal by 18 units to determine that the actual GCS shelter cost in the proposal was $106,171, not the $75,651 represented on page 147 of the document (*see* R4, tab 18 at 25-26). Thus, DCAA concluded that there was no shortfall between a proposed and actual price. The same conclusion applied to the MSM shelters. The CO agreed and determined in the final decision that the government was entitled to a price adjustment for the entire Task Z7 cost of $415,800 (R4, tab 18 at 5).

17. It is undisputed that all of the information upon which the government based its March 2017 claim for shelter costs was contained in the April 2006 FRP IV proposal (ASUMF ¶¶ 20, 34; *see* gov't resp. at 19 ("the duplication was not caught by the contracting officer")). The government contends, however, that the claim "only became 'knowable' once auditors engaged in a deeper examination of the proposal" in 2013 (gov't resp. at 20).

*Labor Hours - $1,453,297*

18. As stated above, Textron informed the government that it had formulated its proposal using a parametric approach based on its FRP III Supplemental proposal. Textron asserts in its motion that it "did not rely in any way on historical labor data to develop its proposed FRP IV labor hours" (ASUMF ¶ 18).

19. On the earlier FRP contracts, Textron provided its labor hours to the Program Office in monthly contract data requirements list (CDRL) reports. CO Wilson was aware of the CDRL reporting requirements on those contracts. (GDMF

4

¶¶ 5- 6, 8)  In the final decision, he acknowledged the existence of this information and the government's access to it and that it contained "the most accurate, complete and current cost or pricing data which existed at the time of the negotiations" (R4, tab 18 at 4-5).  But he stated that "[i]t may have been possible that historic labor hours could have been retrieved [by the government] from the periodic report[s] if significant time and effort were expended.  However, even if the periodic reports constitute disclosure, they do not constitute meaningful disclosure."  (*Id.* at 5)

20.  The government's claim is not premised upon the mere existence of this information, however.  In the final decision, the CO found that prior to submission of its FRP IV proposal, Textron had conducted an analysis of its actual labor hours per system produced for prior FRP lots, and compared them to its hours bid for the FRP IV system.  Textron presented a document containing this information to its upper management on January 24, 2006, one week before submission of its FRP IV proposal.  (R4, tab 18 at 5)  The CO stated that this "analysis, in the form of a labor table . . . presented the historical data in a clear, concise and easy-to-read and an easy-to-understand format. . . . but was not disclosed to the Government as it should have been" (*id.*).  It is undisputed that Textron did not provide this document or the results of its analysis to the government in 2006 (GASUMF ¶¶ 41, 44; app. resp. to GASUMF ¶¶ 41, 44).

21.  As a result of Textron's preparation of this analysis, the government disputes Textron's assertion that it did not rely in any way on historical labor data to develop its proposed FRP IV labor hours.  The government further contends that, as a result of Textron's possession of this analysis, the parties did not negotiate on a level playing field. (GDMF ¶¶ 18, 22)

22.  DCAA received the January 24, 2006, presentation from Textron on May 13, 2013, (GSAUMF ¶ 52).  The government contends that the statute of limitations began to run on the date DCAA received the presentation.

23.  Textron filed a timely appeal on June 6, 2017, that the Board docketed as No. 61195.

24.  Five days before filing that appeal, on June 1, 2017, Textron submitted what it called a "protective claim" to the CO in which it raised various affirmative defenses to the government's claim, including the statute of limitations.  There is no final decision for this claim in the record.  Textron filed an appeal on October 2, 2017, that the Board docketed as No. 61356.  The Board consolidated the appeals on October 17, 2017.

5

I. *Procedural Standards*

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). On summary judgment "all evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable factual inferences should be drawn in favor of the nonmoving party." *Dairyland Power Co-op. v. United States*, 16 F.3d 1197, 1202 (Fed. Cir. 1994). "[W]e are guided by the observation that 'the factual complexity of defective pricing cases argues for caution in assessing motions for summary judgment in such cases." *Lord Corp.*, ASBCA No. 54940, 06-2 BCA ¶ 33,314 at 165,168 (quoting *Grumman Aerospace Corp.*, ASBCA No. 35185, 92-3 BCA ¶ 25,059 at 124,879).

Textron moves for summary judgment that the government's claim is barred by the statute of limitations; the government moves for a ruling that it is not barred. The Board concludes that the government's motion is superfluous and requires no action by the Board. We treat the government as the nonmoving party. Textron also moves for summary judgment on the merits of the labor hours and POP 300 Payload claims.

II. *The CDA Statute of Limitations*

The statute of limitations is an affirmative defense for which the moving party bears the burden of proof. *Sikorsky Aircraft Corp. v. United States*, 773 F.3d 1315, 1319-22 (Fed. Cir. 2014).

Pursuant to the Contract Disputes Act (CDA), "[e]ach claim by the Federal Government against a contractor relating to a contract shall be submitted within 6 years after the accrual of the claim." 41 U.S.C. § 7103(a)(4)(A). When the parties entered into this contract in 2006, the FAR provided that:

> Accrual of a claim means the date when all events, that fix the alleged liability of either the Government or the contractor and permit assertion of the claim, were known or should have been known. For liability to be fixed, some injury must have occurred. However, monetary damages need not have been incurred.

FAR 33.201.

The events fixing liability "should have been known" when they occurred unless they were either concealed or inherently unknowable at the time. *Alion Sci. &*

*Tech. Corp.*, ASBCA No. 58992, 15-1 BCA ¶ 36,168 at 176,489 (citing *Raytheon Missile Sys.*, ASBCA No. 58011, 13 BCA ¶ 35,241 at 173,017). A claimant need not have actual knowledge of all the relevant facts for a cause of action to accrue. *FloorPro, Inc. v. United States*, 680 F.3d 1377, 1381 (Fed. Cir. 2012). Only facts that could not reasonably be known by the claimant postpone claim accrual. *Alion*, 15- 1 BCA ¶ 36,168 at 176,489 (citing *United States v. Commodities Export Co.*, 972 F.2d 1266, 1272 (Fed. Cir. 1992)).

"'In evaluating when the claimed liability was fixed, we first examine the legal basis of the claim.'" *McDonnell Douglas Servs., Inc.*, ASBCA No. 56568, 10-1 BCA ¶ 34,325 at 169,528 (quoting *Gray Personnel, Inc.*, ASBCA No. 54652, 06-2 BCA ¶ 33,378 at 165,475). In a defective pricing claim the government is required to prove that: (1) the information in dispute is "cost or pricing data" under The Truth in Negotiations Act; (2) the cost or pricing data was not meaningfully disclosed; and (3) the government relied to its detriment upon the inaccurate, noncurrent or incomplete data presented by the contractor. *Id.* "'[O]nce nondisclosure is established a rebuttable presumption arises that a contract price increase was a natural and probable consequence of that nondisclosure.'" *Id.* (quoting *McDonnell Douglas Helicopter Sys.*, ASBCA No. 50447 *et al.*, 00-2 BCA ¶ 1,082 at 153,465).

The Board has rejected a bright line rule in defective pricing cases that the statute begins to run on the date that the parties execute the contract. *Lord Corp.*, 06 - 2 BCA ¶ 33,314 at 165,169-70.

III. *Discussion*

"In enacting the Truth in Negotiations Act [TINA], Congress recognized that in a noncompetitive atmosphere, contractors had little motivation to base their prices on the lowest possible costs." *Unisys Corp. v. United States*, 888 F.2d 841, 844 (Fed. Cir. 1989) (citing *Hardie-Tynes Mfg. Co.*, ASBCA No. 20367, 76–1 BCA ¶ 11,827, at 56,475-80). TINA provides that when a contract exceeds a certain value, the contractor must submit cost or pricing data and certify that the data was accurate, complete and current. *Wynne v. United Technologies Corp.*, 463 F.3d 1261, 1262 (Fed. Cir. 2006) (citing what in 2006 was 10 U.S.C. § 2306a(a)(1) & (2)). The government will be awarded a contract price adjustment when it proves that a contractor submitted defective cost or pricing data. *Id.*; 10 U.S.C. § 2306a(e)(1)(A).

In April 2006, TINA defined cost or pricing data to mean "all facts that, as of the date of agreement on the price of a contract . . . a prudent buyer or seller would reasonably expect to affect price negotiations significantly. Such term does not include information that is judgmental, but does include the factual information from which a judgment was derived." 10 U.S.C. § 2306a(h)(1). The statute and the FAR

required the contractor to certify the data as accurate, complete, and current. 10 U.S.C. § 2306a(a)(2); FAR 15-403-4(b).

FAR 52.215-10, as incorporated in the contract (SOF ¶ 5), provided:

> (a) If any price, including profit or fee, negotiated in connection with this contract, or any cost reimbursable under this contract, was increased by any significant amount because—
>
> (1) The Contractor or a subcontractor furnished cost or pricing data that *were not complete, accurate, and current as certified in its Certificate of Current Cost or Pricing Data*;
>
> . . . or
>
> (3) . . . furnished data of any description that were not accurate, *the price or cost shall be reduced accordingly* and the contract shall be modified to reflect the reduction.

FAR 52.215-10(a) (emphasis added).

Consistent with these requirements, during negotiations Textron submitted a Certificate of Current Cost or Pricing Data (SOF ¶ 5), which provided in relevant part that the cost or pricing data it had submitted "are accurate, complete, and current as of 28 April 2006" (R4, tab 2). At the bottom of the document, Textron added a statement that "Estimates were based on AAI's proposal dated April 2005, for FRP Lot III Supplemental."

A. *POP 300 Payload*

Based on the record developed to date, the CO did not know in 2006 that Textron had locked in a subcontractor price of $165,855 just weeks before signing the Certificate of Cost or Pricing Data (SOF ¶ 11). The undisputed facts indicate that Textron disclosed an FRP III Supplemental price of $162,683 and escalated it to $181,558 (SOF ¶ 9). The record lacks undisputed facts to support a finding that in 2006 the CO knew or should have known about the actual $165,855 price because Textron failed to disclose it to him and he had no apparent way to learn of it on his own. Textron has not proposed a credible alternate date for the running of the statute prior to DCAA's receipt of the relevant documents in 2013 (SOF ¶ 11). Thus, it is not entitled to summary judgment on the statute of limitations.

8

On the merits, Textron contends that it disclosed the $162,683 price from the earlier contract and disclosed that it had escalated the price, and that this was enough to comply with TINA (app. mot. at 9-10; app. reply at 5). The Board disagrees that this was sufficient as a matter of law. As stated above, in 2006 TINA defined cost or pricing data to mean "all facts that. . . a prudent buyer or seller would reasonably expect to affect price negotiations significantly." 10 U.S.C. § 2306a(h)(1). The government has made a plausible case that Textron's success in locking in a $165,855 price would have affected negotiations significantly. Drawing reasonable inferences in favor of the government, the Board expects that the CO would have been keenly interested in the $165,855 price when he negotiated with Textron and evaluated the escalation it sought. Similarly, with respect to Textron's certification that the cost or pricing data it had submitted "are accurate, complete, and current as of 28 April 2006," the government has made a plausible case that the certification was not accurate or complete because it failed to disclose the $165,855 price.

These appeals appear comparable to *Aerojet Solid Propulsion Co. v. White*, 291 F.3d 1328 (Fed. Cir. 2002). In that appeal, the contractor supplied nitroplasticizer to the government. It submitted a cost for a key component, nitroethane, at $1.98/lb in its proposal. It did not disclose to the government that it had sealed nitroethane quotes that it did not open until the conclusion of negotiations. Those quotes proved to be as low as $1.45/lb. The Federal Circuit held that knowledge of the undisclosed bids "clearly was information a prudent buyer or seller reasonably would expect to affect price negotiations significantly. . . " *Id.* at 1329. While the contractor did not know that the price would be lower than the bid price before the conclusion of negotiations, the Federal Circuit refused to accept that as a defense. The court of appeals held that "[c]ost or pricing data simply is not any less cost and pricing data because it has been selectively disseminated or not actually used." *Id.* at 1332. The court affirmed a Board opinion awarding the government the cost above $1.45/lb. *Id.* at 1330-32. *See Cutler-Hammer, Inc. v. United States*, 416 F.2d 1306, 1313-15 (Ct. Cl. 1969) (a contractor must disclose a lower subcontractor quote to the government if the contractor considers using it).

In these appeals, Textron had more than *Aerojet's* unopened quote from a subcontractor or supplier, which by its very nature could be higher or lower than the price submitted to the government. Textron possessed a firm price from a subcontractor that was lower than the submitted price (as escalated). This would appear to place the government on stronger ground in contending that a prudent buyer or seller would have expected knowledge of this fact to affect the negotiations significantly and that its disclosure was mandatory. It also places the government on solid ground in contending that the certification was not accurate and complete. *See Cutler-Hammer*, 416 F.3d at 1313-14 (although there was reason to doubt the legitimacy of a subcontractor's bid because it was so low, it had to be disclosed once the contractor considered it).

9

Textron is not entitled to summary judgment on the merits.

B. *Shelter Costs*

Textron is entitled to summary judgment that the shelter costs claim is time barred. It is undisputed that in 2006 the government had all of the information upon which it would base its claim, namely the proposal itself. The government's claim was merely the result of DCAA's analysis of that proposal (SOF ¶ 16).

The Board has no doubt that the duplication in costs on proposal pages 10-11 and 53-54 on the one hand, and page 147 on the other, might not have jumped off the pages on a first read. But, as the Board has held, "claim accrual does not turn upon what a party subjectively understood; it objectively turns upon what facts are reasonably knowable." *Raytheon Missile Sys.*, 13-1 BCA ¶ 35,241 at 173,017 (citing, among other precedent, *United States v. Commodities Export Co.*, 972 F.2d 1266, 1272 (Fed. Cir. 1992) (under 28 U.S.C. § 2416, once the facts making up the essence of the cause of action are reasonably knowable, the statute of limitations is running)).

Even if the government did not immediately grasp the problem with the numbers in Textron's proposal, it had six years to scrutinize it more closely. Claim accrual is not suspended simply because the government failed to appreciate the significance of what the contractor furnished. *Raytheon Missile Sys.*, 13-1 BCA ¶ 35,241 at 173,018. While DCAA may have been in the best position on the government's side to uncover the duplication in costs, claim accrual is not suspended because the government has not placed information already in its possession before an auditor. *Id.*

The government makes an alternate argument based on two FAR clauses incorporated in the contract, the Audit and Records clause, FAR 52.215-2, and the Price Reduction for Defective Cost or Pricing Data clause, FAR 52.215-10 (SOF ¶ 5). As the government states, the former clause requires the contractor to makes its records available for audit for up to three years after final payment, which occurred in March 2011 (gov't supp. br. at 2, citing R4, tab 1 at 74). In the government's view, it had until March 2014 to perform an audit, and then six more years for the CO to issue a final decision, or about 14 years from the date of contract execution to issuance of a claim (*id.* at 3-4). The obvious weakness in this argument is that while the clause does require the contractor to make its records available for three years after final payment, it contains no language that purports to suspend claim accrual until the government performs an audit.[5]

---

[5] For similar reasons, the Board is unpersuaded by the government's citation to Board decisions issued prior to the enactment of a CDA statute of limitations that discuss this clause.

With respect to FAR 52.215-10, the government relies on a provision in the clause that bars the contractor from raising as a defense that the CO "should have known that the cost or pricing data in issue were defective even though the Contractor or subcontractor took no affirmative action to bring the character of the data to the attention of the" CO. FAR 52.215-10(c)(1)(ii). The government contends that even raising a statute of limitations defense is a violation of this clause (gov't supp. br. at 5). The board disagrees. We read this clause as prohibiting the contractor from defending the merits of the claim by raising what is akin to a *caveat emptor* defense. The clause does not nullify or even address the CDA statute of limitations.

Finally, the government contends that if the Board concludes that its claim accrued in 2006, then it is entitled to the benefit of the accrual suspension rule discussed by the Federal Circuit in *Ingrum v. United States*, 560 F.3d 1311 (Fed. Cir. 2009). The plaintiff in that case sued for a Fifth Amendment taking after the government entered his land and removed fill material, but he did not file suit within the six year limitations period. *Id.* at 1313-14. The court held that the accrual suspension rule is strictly and narrowly applied and the accrual date will be suspended only if the plaintiff shows that (1) the defendant concealed his acts with the result that the plaintiff was unaware of their existence, or (2) the injury was inherently unknowable at the time the action accrued. *Id.* at 1315.

The plaintiff sought the benefit of the rule because his property was in a remote location. The plaintiff contended that during the limitations period a southern road was often washed out or it was otherwise inconvenient to make a 12-hour drive to access this road when it was open, and that access from a northern road was "untenable" because of additional driving on unpaved roads. *Id.* at 1313, 1317. The Federal Circuit rejected these contentions, concluding that none of these problems rendered his claim inherently unknowable. *Id.* at 1317.

In these appeals, the government contends that we could apply either the concealed or the inherently unknowable parts of the test. It contends that the "duplication could reasonably be construed as concealed within the proposal." It further contends that because the CO did not notice the duplication in 2006 it was, therefore, inherently unknowable. (Gov't resp. at 20)

Neither of these contentions is convincing. While simple long division was required to uncover this claim, that does not make it inherently unknowable. We further observe that the required calculations were far less onerous and time consuming than accessing Mr. Ingrum's property. Nor has the Board seen any evidence that Textron attempted to conceal its conduct. Indeed, the proposal clearly stated that Textron was adding additional costs for the shelters and it set forth the calculations (SOF ¶ 15). There is simply no evidence of misconduct rising to the level of trickery. *Raytheon Missile Sys.*, 13-1 BCA ¶ 35,241 at 173,018.

11

The Board grants Textron summary judgment that the duplication in costs claim is barred by the statute of limitations.

B. *Labor Hours*

The labor hours' issue is similar to the shelter cost duplication in that the government had all of the information from which a claim could have been derived in 2006. But the differences outweigh that similarity, however, and lead us to a different result.

Unlike the shelter costs, the labor hours were not in the bid itself but in monthly reports that went back to 1999 (SOF ¶ 19). Accordingly, there is a great difference in the degree of effort required to uncover the defective pricing. While only a few calculations were required to uncover the shelter duplication (SOF ¶ 16), that was not the case with respect to the labor hours because the government would have had to analyze years of data.

The question then is whether the government could have been expected to perform such an examination. We think not. Congress required contractors to certify their data and submit it to the contracting officer. 10 U.S.C. § 2306a(a)(2) & (3)(A). There would be no point in such a requirement if the CO were not entitled to rely on it. If the Board were to rule that the government must conduct a forensic examination of years of data at the time of bid notwithstanding the certification, it would defeat the purpose of the certification.

As explained in the Statement of Facts, the government's claim is not based on the mere existence of the monthly reports. Rather, Textron performed an analysis of the data and created a one-page document that summarized it. It is undisputed that this document exists and that Textron failed to provide it to the government. (SOF ¶ 20) Thus, our discussion in the preceding paragraph as to whether the government is required to conduct its own analysis of the monthly reports becomes academic when we add the fact that Textron did so. As the Federal Circuit held in *Aerojet*, "[a] primary objective of TINA is to place government and private contractors in roughly equal positions during contract negotiations." *Aerojet*, 291 F.3d at 1330 (citing *Unisys Corp. v. United States*, 888 F.2d 841, 844 (Fed. Cir.1989)). The parties cannot be in roughly equal positions if one side has an analysis that distills years of data and the other does not. *See Unisys*, 888 F.2d at 843 (in negotiations for a 13th lot of computers, contractor submitted defective pricing when it failed to disclose data for Lot 11 that became available before the conclusion of negotiations); *McDonnell Aircraft Co.*, ASBCA No. 44504, 97–1 BCA ¶ 28,977 at 144,316 (contractor is obligated to disclose an analysis even if it is a draft or marked as preliminary).

Textron's motion is denied on the labor hours claim.

CONCLUSION

Textron's motion is granted on the shelter cost duplication; otherwise it is denied.

Dated: March 23, 2022

MICHAEL N. O'CONNELL
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 61195, 61356, Appeals of AAI Corporation, d/b/a Textron Systems, Unmanned Systems, rendered in conformance with the Board's Charter.

Dated: March 23, 2022

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals