*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 06a0463p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA *ex rel*. ROGER L.
SANDERS and ROGER L. THACKER,

                                *Relators-Appellants,*

        *v.*

ALLISON ENGINE COMPANY, INC., GENERAL
MOTORS CORPORATION, GENERAL TOOL COMPANY,
and SOUTHERN OHIO FABRICATORS,

                                *Defendants-Appellees.*

No. 05-3502

>

---

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 95-00970—Thomas M. Rose, District Judge.

Argued: June 2, 2006

Decided and Filed:  December 19, 2006

Before:  BATCHELDER, GIBBONS, and COOK, Circuit Judges.

---

## COUNSEL

**ARGUED:** James B. Helmer, Jr., HELMER, MARTINS, RICE & POPHAM, Cincinnati, Ohio, for Appellants.  Glenn V. Whitaker, VORYS, SATER, SEYMOUR & PEASE, Cincinnati, Ohio, for Appellees.  Steve Frank, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Amici Curiae.  **ON BRIEF:** James B. Helmer, Jr., Paul B. Martins, Robert M. Rice, HELMER, MARTINS, RICE & POPHAM, Cincinnati, Ohio, Scott A. Powell, Don McKenna, HARE, WYNN, NEWELL & NEWTON, Birmingham, Alabama, for Appellants.  Glenn V. Whitaker, Victor A. Walton, Jr., VORYS, SATER, SEYMOUR & PEASE, Cincinnati, Ohio, for Appellees.  Steve Frank, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., Joseph E. B. White, TAXPAYERS AGAINST FRAUD EDUCATION FUND, Washington, D.C., for Amici Curiae.

       GIBBONS, J., delivered the opinion of the court, in which COOK, J., joined. BATCHELDER, J. (pp. 15-16), delivered a separate opinion concurring in part and dissenting in part.

1

---

**OPINION**

---

JULIA SMITH GIBBONS, Circuit Judge. This case is the consolidation of two False Claims Act suits alleging fraud in the negotiation and execution of subcontracts relating to the construction of United States Navy Arleigh Burke-class Guided Missile Destroyers. The destroyers are built primarily by two shipyards – Bath Iron Works ("Bath") and Ingalls Shipbuilding (collectively "the shipyards"). The construction involves hundreds of subcontracts for the components and parts that make up the ships, each of which costs approximately one billion dollars.

Each destroyer contains three generator sets ("Gen-Sets") that supply all of the electrical power for the ship. The shipyards contracted with defendant-appellee Allison Engine Company ("Allison"), which for a period of time relevant to this lawsuit was a division of defendant-appellee General Motors Corporation, to build approximately ninety Gen-Sets to be used in over fifty destroyers. Allison in turn subcontracted the assembly of each Gen-Set to defendant-appellee General Tool Company ("GTC"), which in turn subcontracted part of its work to defendant-appellee Southern Ohio Fabricators ("SOFCO"). Thus, the shipyards were the prime contractors (contracting directly with the Navy). Allison was a first-tier subcontractor. GTC was a second-tier subcontractor, and SOFCO was a third-tier subcontractor. Relators-appellants Roger L. Sanders and Roger L. Thacker ("relators") are former employees of GTC who worked on the Gen-Set assembly teams. Relators brought two separate *qui tam* actions under the False Claims Act ("FCA"), 31 U.S.C. § 3729, alleging fraud against Allison, General Motors, GTC and SOFCO (collectively "defendants") in connection with the construction of the Gen-Sets. *See id.* § 3730(b)(1). The United States declined to intervene in the cases.[1]

The first action (referred to by the parties as the "Quality Case") alleges that the defendants submitted claims for payment despite knowing that the Gen-Sets did not conform to contract specifications or Navy regulations, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)-(3). The district court construed § 3729 to require a showing that a false claim had actually been presented to the United States government ("government") for liability to attach. Because relators made no such showing at trial, the court granted judgment as a matter of law to the defendants at the close of relators' case pursuant to Fed. R. Civ. P. 50(a). We can discern no presentment requirement in § 3729(a)(2) or (3), and reviewing *de novo*, *see Gray v. Toshiba Am. Consumer Prods.*, 263 F.3d 595, 598 (6th Cir. 2001), we find this ruling to be in error and reverse. The second action (referred to by the parties as the "Pricing Case") alleges that the subcontractors withheld cost or pricing data during negotiations with the government's agent in violation of the Truth in Negotiations Act ("TINA"), 10 U.S.C. § 2306a, and the FCA. The district court granted summary judgment to the defendants, finding that at the time of the negotiations, the defendants did not know for a fact that their costs would be reduced, and thus they had no obligation to disclose their mere hope or expectation that costs could be lowered. Again reviewing *de novo*, *see Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 657 (6th Cir. 2000), we agree and affirm.

---

[1]The statute governing *qui tam* actions under the False Claims Act allows the government to intervene in the district court and take over responsibility for conducting the litigation. *See* 31 U.S.C. § 3730(b)(2)-(4). In this case, although the government declined to intervene, it did appear as *amicus curiae* before this court in favor of relators in the Quality Case.

I.

In the Quality Case, relators allege that the defendants knew of a number of defects in the construction of the Gen-Sets and knew that the defects constituted a violation of their respective contracts but nevertheless submitted invoices for payment.[2]  As a result, these invoices constituted "false or fraudulent claims" that were paid with government funds in violation of the False Claims Act, 31 U.S.C. § 3729. *See United States ex rel. Compton v. Midwest Specialities, Inc.*, 142 F.3d 296, 304 (6th Cir. 1998).  Specifically, relators brought claims under § 3729(a)(1), (2), and (3).

The case was tried before a jury, and relators spent five weeks presenting evidence of the various defects.  Relators introduced evidence that all of the money used to pay the relevant prime contracts and subcontracts, including all the money paid to the defendants, came from the government.  Relators also introduced into evidence hundreds of invoices remitted for payment by the subcontractors (i.e., Allison to the shipyards, GTC to Allison, and SOFCO to GTC).  Relators did not, however, present any evidence that the subcontractors or the shipyards ever presented any false or fraudulent claim directly to the United States or the Navy for payment.[3]  At the close of relators' case, defendants moved for judgment as a matter of law on the grounds that the lack of evidence of any false claim presented to the government meant that no reasonable jury could find a violation under the FCA.  The district court accepted this argument and granted the motion.  Relying on *United States ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488 (D.C. Cir. 2004), *cert. denied* 544 U.S. 1032 (2005), the court held that liability under the FCA required a showing that a false or fraudulent claim was *presented to the government*, either by the defendants or by the prime contractor.

A.

The plain language of § 3729, the legislative history accompanying the most recent change to the statute, and the policy rationales behind the False Claims Act do not support the district court's reading of the statute.  The FCA states in relevant part:

Any person who:

(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;
(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; [or]
(3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid[,]
. . .
. . . is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person . . . .

31 U.S.C. § 3729(a).  Section (c) of the FCA sets forth the definition of a "claim":

---

[2] The exact defects are not relevant to this appeal but include the use of unqualified workers in constructing the Gen-Sets; faulty gearboxes in Gen-Sets that leaked oil, overheated and/or had defective temperature gauges; and the omission of final inspections required by military regulations.

[3] Counsel for relators admitted at the hearing on the Rule 50(a) motion, "[W]e haven't shown you Bath's invoices to the United States, and we're not going to show you those because they are totally irrelevant under the False Claims Act . . . ."

> For purposes of this section, "claim" includes any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

*Id.* § 3729(c). The FCA was passed in 1863 in response to fraud perpetuated by defense contractors during the Civil War. Originally, it contained both a criminal and a civil component; the criminal component has since been separated and codified in a different section of the United States Code. This case concerns only the civil portion of the FCA.

To determine the meaning of a statute, this court first looks to the language of the statute itself. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 98 (2003) (citing *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992)); *Cox v. Mayer*, 332 F.3d 422, 424 (6th Cir. 2003). The plain language of the FCA states that actual presentment of a claim to the government is required under one, but not all, of the statute's sections. Only subsection (a)(1) of the statute makes any mention of presenting a claim to the government or Armed Forces. Subsections (a)(2) and (a)(3), which are separate bases for liability, contain no such presentment language. Subsection (a)(2) requires only that a defendant "make[]" or "use[]" a "false record or statement" in order to induce the government to pay or approve a claim. 31 U.S.C. § 3729(a)(2). Subsection (a)(3) requires a conspiracy to defraud the government to pay or allow a false claim. *Id.* § 3729(a)(3). The definition of "claim" in part (c) further supports the reading that presentment is not required under all sections of the statute. A claim is "*any* request or demand . . . for money or property which is made to a contractor . . . if the United States provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor . . . for any portion of the money or property which is requested or demanded." *Id.* § 3729(c) (emphasis added). The focus of this language is on the money paid out by the government in response to a false statement or fraudulent request for payment. There is nothing in this language to suggest the claim must be shown to have been presented to the government, so long as it can be shown that the claim was paid with government funds.

The legislative history of the FCA solidifies this interpretation of the statutory language. The committee reports written when Congress restructured § 3729 in 1986, breaking section (a) into subsections and adding subsection (c), indicate that Congress intended to broaden the reach of the FCA to cover fraudulent claims submitted by subcontractors that result in loss to the government. The purpose of the 1986 change was "to enhance the Government's ability to recover losses sustained as a result of fraud . . . ." S. Rep. No. 99-435, at 1 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5266. The Senate Report goes on to note that the amendment was "aimed at correcting restrictive interpretations of [the FCA]" by the courts "in order to make the [FCA] a more effective weapon against Government fraud." *Id.* at 5269. The Report clearly states that the FCA "is intended to reach all fraudulent attempts to cause the Government to pay out sums of money." *Id.* at 5274. "[A] false claim is actionable although the claims or false statements were made to a party other than the Government, if the payment thereon would ultimately result in a loss to the United States." *Id.* at 5275. "For example, a false claim to the recipient of a grant from the United States or to a State under a program financed in part by the United States, is a false claim to the United States." *Id.* The House Report reached a similar conclusion: "[C]laims or false statements made to a party other than the Government are covered by this term if the payment thereon would ultimately result in a loss to the United States." H.R. Rep. No. 99-660, at 21 (1986). There is no indication that a claim must be presented to the government in order to be actionable; the statute covers false claims made to parties other than the government so long as the claim will be paid with government funds.

These reports provide strong evidence that Congress intended the 1986 amendments to overrule restrictive judicial interpretations of the FCA and increase the reach of the statute. By re-wording the statute and adding subsection (c), Congress accomplished this expansion, including making the FCA applicable to cases in which the government sustains a financial loss, regardless of whether the false claim is actually presented to the government. Reading a presentment requirement into subsections (a)(2) and (a)(3) is contrary to this purpose and contradicts the plain language of the statute.

B.

The district court, relying on the D.C. Circuit's decision in *Totten*, 380 F.3d 488, did just this. The issue in *Totten* was whether the submission of a false claim to Amtrak, which Amtrak paid with funds including federal grant money, violated the False Claims Act. The court, with a dissent by United States Circuit Judge Merrick Garland, held that it did not, because Amtrak was a federal grantee, not part of the government, and liability under the FCA is contingent upon a showing that the false claim was "presented to an officer or employee of the Government." 380 F.3d at 490. To reach this conclusion, the court first noted the plain language of subsection (a)(1) requiring presentment to the government. *Id.* at 497. The court next held that subsection (a)(2) also contains a presentment requirement. Though the presentment language is not present in subsection (a)(2), the majority reasoned that because the two sections were previously part of the same clause, subsection (a)(2) must be read in conjunction with the presentment language in subsection (a)(1). *Id.* at 499-500. The court read the "by the Government" language in subsection (a)(2), which was added in 1986, as referring back to the presentment language in subsection (a)(1), *id.* at 499, despite the fact that these clauses are disjunctive and a litigant need only satisfy subsection (a)(1) *or* (a)(2) to prove an FCA claim. *See* 31 U.S.C. § 3729(a). The court also read this language as limiting the reach of section (c). *Totten*, 380 F.3d at 499. By adding the clause, the court reasoned, "Congress was reinforcing – rather than abandoning – the distinction between the Government and its grantees that might otherwise have been blurred by the addition of Section 3729(c)." *Id.* The court thus concluded that any claim brought under the FCA requires evidence that an actual claim was presented to the government before liability can attach. *Id.* at 502.

We disagree with the *Totten* court's interpretation of the FCA for several reasons. One, the plain language of subsections (a)(2) and (a)(3) simply does not require that a claim must be presented to the government to be actionable. Congress could have chosen to include the presentment language of subsection (a)(1) in other parts of the FCA and did not. The Supreme Court has consistently counseled against attributing the same meaning to different language in the same statute. *See Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002) ("[W]hen Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (internal quotation marks omitted); *Russello v. United States*, 464 U.S. 16, 23 (1983) ("We refrain from concluding [] that the differing language in two subsections has the same meaning in each."). Moreover, reading presentment into subsection (a)(2) would give it almost the same meaning as subsection (a)(1), rendering the latter largely superfluous.[4] *See Totten*, 380 F.3d at 507 (Garland, J.,

---

[4] The dissent argues that this statement is incorrect because subsection (a)(1) "addresses false claims presented directly to the government, while Section (a)(2) addresses false claims submitted through a messenger, despite a lack of scienter on the part of the messenger." However, this reading of the statute overlooks the clear purposes of the two statutory sections. Subsection (a)(1) punishes an individual who "presents or causes to be presented" a false or fraudulent claim. This language addresses exactly the two scenarios posited by the dissent: *i.e.*, whether a party actually presents a false claim to the government or causes the presentation of that false claim through an intermediary, liability under subsection (a)(1) may attach.

Subsection (a)(2), on the other hand, punishes conduct comprising the transmission of false statements or

dissenting).  The "cardinal principle of statutory construction," however,  is "to give effect, if possible, to every clause and word of a statute rather than to emasculate an entire section." *Bennett v. Spear*, 520 U.S. 154, 173 (1997) (internal citations, quotations, and alterations omitted).  The FCA cannot be read so as to make the meanings of subsections (a)(1) and (a)(2) indistinguishable.

The *Totten* majority reasons that the opposite reading – subsection (a)(2) does not have a presentment requirement – would make the presentment requirement in subsection (a)(1) "largely meaningless." *Totten*, 380 F.3d at 501.  Why, the *Totten* majority asks, would any plaintiff bring a claim under subsection (a)(1) when she could just use the more lenient subsection (a)(2) for all claims? *Id.*  The answer is that subsection (a)(2) contains its own more burdensome requirement – the claim must have actually been paid.  This is not an element of all FCA actions.  As the Supreme Court and other courts have held, an individual can be liable under the FCA for presenting a fraudulent claim to the government, even if the government discovers the fraud in time and does not actually pay out any money.  *See Rex Trailer Co. v. United States*, 350 U.S. 148, 153 & n.5 (1956); *United States v. Rivera*, 55 F.3d 703, 709 (1st Cir. 1995).[5]  These claims can be brought under § 3729(a)(1), which covers the presentment of a false or fraudulent claim to the government or its agent "*for* payment or approval," regardless of whether the payment was actually made.  Evidence that a claim was presented is necessary under this section because without it, there would be nothing to tie the claim to the government (as no government money was expended).  In contrast, for liability to attach under subsection (a)(2), it is not sufficient to allege that the claim was merely submitted for payment.  Rather, the claim must have been "*paid or approved*" by the government.  Evidence that the claim has been "paid or approved" provides a sufficient link to the government; evidence that a claim was actually presented to the government is not necessary.  *Cf. United States v. Kitsap Physicians Serv.*, 314 F.3d 995, 1003 (9th Cir. 2002) ("[The FCA] requires a real false claim, either in the form of the false claim itself or evidence sufficient to identify such a claim.").  Subsection (a)(3) covers still different conduct – a conspiracy to defraud the government using false claims.  Each subsection of § 3729(a) covers distinct conduct without reading language into the statute.

---

records in order to obtain government payment or approval of a false claim.  Requiring that these statements or records be submitted to the government directly would defeat the obvious purpose of the statute: reaching conduct that is independent of the submission of the false claim itself.  Subsections (a)(1) and (a)(2) reach two distinct types of conduct, and there is no support for a reading of subsection (a)(2) (or (a)(3) for that matter) that imposes a presentation requirement in the absence of statutory language that would compel such a result.

[5] Referring to subsection (a)(2), the dissent observes that "[t]he majority cites no authority to support the proposition that this section requires that the claim has already been paid or that mere submission of a false claim is insufficient, and in fact cites authority to the contrary."  The "authority to the contrary" to which the dissent refers consists of  *Rex Trailer* and *Rivera.*  To our knowledge, no authority exists either supporting the proposition that a claim must have been paid or approved to establish a violation of subsection (a)(2) or rejecting it.  This is an issue of first impression, and our reading is based on the statutory language.  Neither *Rex Trailer* nor *Rivera* addresses the question of the correct interpretation of subsection (a)(2).  *Rex Trailer* predates by some thirty years the current version of the FCA–the version that first separated subsections (a)(1) and (a)(2).  We cite it for the point that an individual can be liable under the FCA even if the government does not pay out any money. That statement was correct in 1956 when *Rex Trailer* was decided and now.  Our reliance on *Rex Trailer* relates to this general principle, not to the issue of whether a claim when the government does not pay or approve payment is now properly brought under subsection (a)(1) rather than subsection (a)(2).  Similarly, *Rivera* reiterates the point made in *Rex Trailer* without any mention of subsections (a)(1) and (a)(2) or their language.  In any event, the issue of whether  an attempt to obtain payment or approval  qualifies as a violation of subsection (a)(2) figures into the analysis only in assessing the soundness of the *Totten* majority's reasoning.  The precise question before us is whether subsection (a)(2) requires presentment, not whether it requires payment.  While we believe that consideration of the payment requirement is instructive, acceptance of the dissent's interpretation of subsection (a)(2) with regard to payment would not  undermine the ultimate conclusion that subsection (a)(1) by its terms requires presentment, while subsection (a)(2) by its terms does not.

In holding that § 3729(a)(2) contains a presentment requirement, the *Totten* court answers a question it was not asked. The primary issue before the court was whether claims submitted to Amtrak, a federal grantee receiving a portion of its funds from the government, constituted presenting a claim "to the Government." 380 F.3d at 490. There is no discussion of what it means to "present" a claim, and it is unclear from the opinion whether any evidence was put forth, as it was in this case, that the money used to pay the defendants came from the government (rather than from non-government funds). *See id.* As the majority states, none of the parties argued that subsection (a)(2) provided separate grounds for relief during six years of litigation, and the majority would not have even considered the subsection (a)(2) argument had the dissent not raised it *sua sponte*. *Id.* at 497. The subsection (a)(2) analysis seems to be almost an afterthought – not so much a *ruling* on the meaning of subsection (a)(2) as a *response* to the arguments made by the dissent on an issue not raised by the parties. *Id.* at 498. In making this response, the majority seems to have misread the plain language of the statute and its legislative history.

C.

While the plain language of the statute and the legislative history provide a conclusive answer to the question before us, we also note that the narrow view of the FCA's scope taken by the *Totten* majority does not comport with the weight of authority interpreting the statute. The Supreme Court has consistently reaffirmed that the FCA is a remedial statute and should be construed broadly. *See United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968); *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 541-42 (1943). The purpose of the FCA is to "protect the funds and property of the Government from fraudulent claims, regardless of the particular form, or function, of the government instrumentality upon which such claims were made." *Neifert-White*, 390 U.S. at 233 (quoting *Rainwater v. United States*, 356 U.S. 590, 592 (1958)). Thus, the FCA covers all claims to government money, even if the claimant does not have a direct connection to the government. For instance, in *Marcus*, the Court held that a collusive bidding process by contractors employed by a local government to work on Public Works Administration projects could give rise to a claim under the FCA. 317 U.S. at 543. Although the workers contracted with the local government rather than the United States and were paid by the local authorities, the fact that the funds for the project derived from the federally-funded Federal Public Works Administration meant that the FCA applied. The Court focused on the federal money being used to pay the fraudulent claims rather than the presence of a local intermediary. *Id.* at 544. Although the Court did not address the issue of whether the claim had to be presented to the government, this case is an early indication that the FCA should be construed broadly.

The Court reaffirmed this position in *Neifert-White*, when it held that a 'claim' does not merely encompass a claim for payment, but can also include an application for a loan of federal money. 390 U.S. at 231-32. Noting that the case "involves a false statement made with the purpose and effect of inducing the Government immediately to part with money," the Court ruled that the definition of "claim" within the FCA cannot be so narrowly defined. *Id.* at 232. "This remedial statute reaches beyond 'claims' which might be legally enforced, to all fraudulent attempts to cause the Government to pay out sums of money." *Id.* at 233.

A number of courts, including this circuit, have followed the Supreme Court's lead in avoiding an overly-narrow construction of the FCA. *See United States ex rel. A+ Homecare, Inc. v. Medshares Mgmt. Group, Inc.*, 400 F.3d 428, 445 (6th Cir. 2005) (establishing a broad test for whether a claim is "material" under the FCA). Citing *Marcus* and *Neifert-White*, the Fourth Circuit set forth a test for FCA liability contrary to the one established in *Totten*. *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 788 (4th Cir. 1999). After noting that the FCA should be broadly construed, *id.* at 786, the court held that "any time a false statement is made in a transaction involving a call on the U.S. fisc, False Claims Act liability may attach." *Id.* at 788. The court set out a four-

factor test: "(1) whether there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or forfeit moneys due (i.e., that involved a 'claim')." *Id.* So long as it can be shown that the government paid out money in response to a claim, no evidence is needed under this test that a claim was presented to the government. This test appears to more accurately reflect the view of the FCA taken by the Supreme Court and Congress.

Other courts, while not directly ruling on the presentment issue, have also broadly construed the FCA. The First Circuit has held that liability under the FCA turns not on whether money was paid out, but on whether "the [false] statement has the practical purpose and effect, and poses the attendant risk, of inducing wrongful payment." *Rivera*, 55 F.3d at 709-10.[6] The Ninth Circuit has also taken a broad view of the FCA, stating that a plaintiff does not even have to bring forth evidence of a false claim, so long as she presents "evidence sufficient to identify such a claim." *Kitsap*, 314 F.3d at 1003. The Third Circuit has come the closest to holding that presentment is not required under the statute. In *United States v. Lagerbusch*, the court upheld a finding of liability under the FCA for claims submitted to a private corporation that received funding from the government. 361 F.2d 449, 449 (3d Cir. 1966). The key issue for the court was that the funds used to pay the claimant originated with the government. *Id.* This alone was sufficient to find liability under the FCA. *Id.* at 449 ("We have no doubt that the False Claims Act covers such an indirect mulcting of the government."). *See also United States ex rel. Luther v. Consol. Indus., Inc.*, 720 F. Supp. 919, 921-22 (N.D. Ala. 1989) (holding that the FCA applies when a claim is presented not to the government, but to a government contractor, so long as "payment of the claim would ultimately result in a loss to the United States").

Turning to the precise issue in this case, the cases cited by the district court and defendants do not support a reading of the FCA to require presentment of a claim to the government. Several discuss the necessity of showing that a "false claim" be made but do not speak as to whether such a claim must be presented to the government. *See Rivera*, 55 F.3d at 709-10; *United States ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 243-44 (3d Cir. 2004); *United States ex rel. Quinn v. Omnicare, Inc.*, 382 F.3d 432, 438-39 (3d Cir. 2004); *Costner v. URS Consultants, Inc.*, 153 F.3d 667, 677 (8th Cir. 1998) (distinguishing between claims made against government funds and claims made against private funds). Other cited cases specifically contradict the defendants' argument by stating or implying that presentment to the government is not required. *See United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 674 (5th Cir. 2003) (defining a claim as a request for money "which is made to someone – including the government itself – who will at least in part use government money or property to pay it"); *Harrison*, 176 F.3d at 788; *Kitsap*, 314 F.3d at 1003.

In addition to *Totten*, defendants primarily rely on a group of cases dealing with the pleading requirements of Fed. R. Civ. P. 9(b) in the context of actions under the FCA. These cases provide only minimal support for reading a presentment requirement into all parts of the FCA. In *United States ex rel. Clausen v. Lab. Corp. of Am.*, the Eleventh Circuit held that the plaintiff must allege the presentment of "an actual false claim for payment" to the government in order to satisfy Rule 9(b)'s heightened pleading requirement. 290 F.3d 1301, 1311 (11th Cir. 2002). The court reasoned that the submission of a claim is the "*sine qua non*" of the FCA; thus, there is no actionable damage absent evidence of presentment. *Id.* The court, however, did not distinguish among subsections of the statute or analyze its language. *See also United States ex rel. Karvelas v. Melrose-Wakefield*

---

[6]Contrary to the district court's opinion and defendants' argument, *Rivera* does not stand for the proposition that a claim must be presented to the government in order to be actionable. The court did not address this issue, as the claim at issue in *Rivera* was presented to the government. 55 F.3d at 710. Moreover, as discussed above, in order to prove a case under the FCA when no money is paid out, it is necessary to show that a claim was presented.

*Hosp.*, 360 F.3d 220, 232-34 (1st Cir. 2004) (relying on *Clausen* to reach a similar conclusion but likewise not engaging in statutory interpretation of the FCA). Further, the two cases on which the *Clausen* court relies – *Harrison*, 176 F.3d 776, and *Rivera*, 55 F.3d 703 – are read out of context and do not support the holding of the case.

This court relied partially on *Clausen* in finding an FCA complaint insufficient under Rule 9(b). *See Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 564 (6th Cir. 2003). The *Yuhasz* court, however, did not read a presentment requirement into the FCA. Rather, the complaint in that case was deemed insufficient because it could not identify any specific parties or specific fraudulent acts that supposedly violated the FCA. *Id.* at 563-64. Although *Yuhasz* quotes cases that imply that a presentment requirement exists in the FCA, the opinion contains no holding or other language that would bind us in this case.

Defendants also suggest that two cases involving the statute of limitations for FCA actions imply a presentment requirement. In the first, this court ruled that the limitations period did not commence "until the first voucher seeking payment of false claims was presented to the United States." *United States v. Ueber*, 299 F.2d 310, 313 (6th Cir. 1962). In the second, the First Circuit stated that because the FCA "attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the 'claim for payment,'" the date of such a claim was definitive in determining the accrual of the limitations period. *Rivera*, 55 F.3d at 709. In neither case, however, did the court squarely address the issue of whether presentment was required, and, in any event, both courts analyzed the version of the FCA in effect prior to the 1986 amendments. Moreover, neither of the cases stated that the presentment of a claim was the *only* act that could commence the limitations period; rather, in the factual situations encountered by those courts, it was the presentment of a claim that started the clock.

At most, the cases cited by the defendants imply that the FCA contains a presentment requirement. None of the cases, however, address the precise issue before this court, and we find them unpersuasive in the present case.

D.

The dissent faults our analysis of the statutory language first by reading subsection (a)(2) as creating a causal connection between the claim and the payment and then by concluding that payment of a claim by the government presupposes that the claim has been presented to the government. We agree that the statute requires a causal connection between the making or use of a false statement and the government's payment or approval of the claim. This causal connection requirement arises from use of the word "get." The false statement's use must result in obtaining or getting payment or approval of the claim. We disagree however that the causal connection requirement suggests that presentment to the government is required under subsection (a)(2) as a matter of law. The elements of subsection (a)(2) can be met without presentment to the government.

In the dissent's own first example of a prime contractor and sub-contractor, if the sub-contractor submits a false bill to the prime contractor which the prime contractor uses to obtain payment of a presented claim (which would itself be false by virtue of the false bill included in it), the sub-contractor can be liable under either subsection (a)(1) or (a)(2). To impose liability on the sub-contractor under subsection (a)(1), the government would have to prove that the sub-contractor caused presentment by the prime contractor. For liability of the subcontractor under subsection (a)(2), the government could omit the proof of presentment but would have to present sufficient evidence from which the trier of fact could conclude that the sub-contractor's use of the false statement resulted in the payment of the claim by the government. The dissent's second example in which the government bankrolls the prime contractor may well present a situation in which the

government is unable to establish the required causal connection because it cannot prove presentment. But that inability to prove a particular type of claim factually without proof of presentment does not mean that as a matter of law presentment is required as an element of all claims under subsection (a)(2). And in the second example, the payment with government funds (although already in the hands of the prime contractor) might permit the inference that the claim had been paid by the government; the flaw in the case would be the omission of the proof of causal connection, *i.e.*, a showing that the false statement was used "to get" the claim paid.

The dissent has essentially characterized what we see as a problem of adequacy of proof in various hypothetical contexts as a question of statutory interpretation. We prefer to accord the statute the meaning expressed by its clear language and to leave the thorny problems of whether a relator has presented sufficient proof of causal connection for resolution in the context of future cases, based on the factual record in those cases. Our analysis of the statutory construction issue can and should end with a determination that presentment is not required as a matter of law to establish a violation of subsection (a)(2) or (a)(3).

E.

The plain language of the statute, the legislative history, and the decisions of the Supreme Court and other courts lead us to conclude that the district court and the *Totten* court erred in reading a presentment requirement into all subsections of the False Claims Act. We hold that while liability under § 3729(a)(1) turns on whether a claim has been presented to the government, subsections (a)(2) and (a)(3) do not require such a showing. Rather, a relator under these two subsections must show that government money was used to pay the false or fraudulent claim. This requirement comports with the policy rationale behind the FCA – protecting the government fisc – while ensuring that the statute applies only to claims submitted to the government and not to private entities.

We note that there will doubtless be cases pursued under subsections (a)(2) and (a)(3) where relators choose to introduce evidence that false claims were presented to the government. Evidence of presentment of a false claim is highly relevant to establishing the requisite intent under subsections (a)(2) and (a)(3). Moreover, claims under subsections (a)(2) and (a)(3) which involve requests for payment by prime contractors rather than subcontractors may perhaps be more easily proved by showing presentment of a false claim to the government. Thus, evidence of presentment may have practical importance in claims under subsections (a)(2) and (a)(3). Our ruling here determines only that presentment evidence is not required for subsection (a)(2) and (a)(3) claims as a matter of law.

Having found that the district court erred in interpreting subsections (a)(2) and (a)(3), we turn to consideration of whether relators presented sufficient proof to avoid judgment as a matter of law. Having reviewed the evidence, a reasonable jury could find for relators despite the lack of evidence of presentment to the government. During trial, relators put forth evidence that all of the money paid to the defendants came from the United States government. Chris Krohne, a program manager at Allison, testified that all of the money for the project "flows from the taxpayers to the Congress to the Department of Navy to Bath, then [to Allison]." He clarified that all of the money paid to Allison, GTC, and SOFCO came from the United States government. Relators also produced the invoices submitted for payment by Allison, GTC, and SOFCO and put forth evidence of knowledge on the part of the contractors that the Gen-Sets did not conform to Navy regulations and that the invoices were paid using government funds. If accepted by a jury, this evidence is sufficient to find that the defendants used a "false record or statement to get a false or fraudulent claim paid by the Government" and/or "conspire[d] to defraud the Government by getting a false or fraudulent claim allowed or paid." 31 U.S.C. § 3729(a)(2), (3). The jury should have been allowed to decide whether

the subcontractors violated subsections (a)(2) and/or (a)(3) by submitting these invoices. The district court erred in granting judgment as a matter of law.[7]

## II.

The Pricing Case stems from a redesign of the Gen-Sets in the early 1990s. Although some confusion exists as to who initiated the discussions, the parties agree that the Navy, the shipyards, and Allison wanted to redesign the Gen-Sets to improve maintenance and increase reliability. The issue in the case is whether Allison and GTC failed to disclose pertinent "cost and pricing data" relating to anticipated cost decreases with Bath and the Navy during the negotiation of the redesign.[8] Any such omission would violate the Truth in Negotiations Act, 10 U.S.C. § 2306a, and because Allison and GTC submitted claims for payment despite knowledge of their non-compliance with all contractual provisions and applicable statutes (including TINA), a cause of action would exist under the False Claims Act. *See Compton*, 142 F.3d at 304.

### A.

The facts of the Pricing Case are as follows. In June 1992, a meeting was held to discuss "possible alternatives" for redesigning the existing AG9130 Gen-Sets. The Navy was concerned about the problems with the AG9130 Gen-Sets and wanted Allison "to do it right this time." After this meeting, Allison began developing a conceptual redesign, which would be model AG9140. In July 1992, GTC informed Allison that after reviewing the preliminary drawings, GTC "does not anticipate any circumstances which would necessitate a request for an increase in the negotiated price . . . ." In the fall of 1992, Allison began constructing a mock-up of the AG9140 to present to the Navy and the shipyards. In December, Allison's program manager summarized a site visit and meeting with Navy and Bath personnel regarding the redesign ("December 1992 memo"). The memo states that the contract modifications will be "no cost" and that the price paid by Bath for each Gen-Set will not increase. The memo also outlined a "long term strategy to reduce the cost of the generator set."

> This reduction will result as the redesign eliminates many parts. We need this reduction to make us more competitive on new programs. Eventually, we are obligated to identify the cost impact of the redesign. Most of the impact is to General Tool. We need to have GTC closely account for hours and material in the first unit of the redesign. After we have built some of the redesign units, we can recalculate our costs with very low risk. Given our current loss situation on the program, I feel we can negotiate a greater percentage profit when we calculate the ECP. We offer the Navy a cost reduction but keep out profit the same as it is now.

The new AG9140 design was approved at a January 1993 design review. At that point, the Navy requested that the first AG9140 Gen-Set be delivered in April 1994 and that the redesign be a "no-

---

[7]The defendants argue in the alternative that the decision of the district court should be affirmed because relators have not shown that any false claims materially affected the government's decision to pay the false claim. Materiality is an element of an FCA claim, *see A+ Homecare*, 400 F.3d at 442, but requires only a showing that any false or fraudulent claim "had the natural tendency to influence or was capable of influencing the government's funding decision." *Id.* at 446 (internal quotation and citation omitted). Relators have satisfied this lenient test. A reasonable jury could easily find that the government's funding decision could have been influenced by the defendants' fraudulent claims that the Gen-Sets complied with Navy specifications. Thus, defendants' alternative argument fails.

[8]The Pricing Case deals only with the contract between Allison and Bath. GTC is also alleged to have covered up its negotiations with Allison. No allegations are made that SOFCO acted improperly in the Pricing Case.

cost" change (i.e., no price increase). In the spring of 1993, Allison met with GTC, and GTC agreed to accept the no-cost modification. Allison then issued an experimental procurement authority form ("EPA Form") requesting a purchase order be issued to GTC for three Gen-Sets. The request stated that the change to the AG9140 design "shall not result in a price increase. A price reduction is anticipated subject to negotiation prior to completion of the order."

In May 1993, Allison submitted its formal Engineering Change Proposal ("ECP") for the AG9140 redesign. The ECP again stated that this is a "no cost" change and that "[t]he recurring costs of the AG9140 remain unchanged from those of the AG9130." It is important to note that for the purposes of the ECP, "cost" is defined as "cost to the Government." *See* U.S. Dep't of Defense, Configuration Control – Engineering Changes, Deviations and Waivers, DOD-STD-480A, ¶ 110.14 (April 12, 1978). In June 1993, Allison submitted an amendment to its purchase order with GTC, formally changing the order to model AG9140 ("June 1993 Purchase Order Amendment"). The document also states, "A price reduction is anticipated. This reduction is subject to negotiation once redesign is finalized and prior to completion of order."

On behalf of the Navy, Bath proceeded to negotiate a price for the proposed ECP. The two parties reached an agreement in November 1993 that the price for the AG9140 model would remain the same as for the AG9130 model. At this time, Allison and GTC had not reached any agreement (or even begun negotiations) on a price for the assembly of the redesigned Gen-Sets. Such an agreement was not reached until December 1994, when the two parties contracted to reduce the amount paid by Allison to GTC by $74,000 per unit. Allison never specifically informed the Navy of these savings, although it did inform Bath in both 1995 and 1996 that "[m]anufacturing cost at General Tool is less" for the new design. Along with this statement, Allison averred that "other areas such as engineering, technical publications, and product support are over the original budgets. Without a new proposal, the net value of these changes is not known." Neither the Navy nor Bath requested a complete proposal, including cost information, from Allison, because it would have taken months to complete and would have delayed construction of the destroyers. Allison fully divulged its new agreement with GTC when it renegotiated its full contract with Bath in late 1996.

The parties cross-moved for summary judgment on the issue of whether the defendants' failure to disclose its plans to lower its costs for the Gen-Sets violated TINA. Disagreeing with the magistrate judge's recommendations, the district court denied summary judgment to relators and granted the defendants' motions for summary judgment. In ruling for the defendants, the court found that Allison did not make a false claim in the May 1993 ECP because "cost" is unambiguously defined as "cost to the government." The court also held that Allison had no duty to disclose its plans to lower costs on the AG9140 because any such ideas were merely speculative during the 1993 negotiations with Bath. Thus, Allison did not withhold any "facts" from the government. By the time Allison knew for a fact that its costs would be lower – when it reached its agreement with GTC – thirteen months had passed since the contract with Bath had been finalized and Allison no longer had a duty to disclose the lower costs.

B.

We agree with the district court. TINA requires subcontractors to make available "cost or pricing data" prior to "the pricing of a change or modification to the subcontract" if the "price adjustment is expected to exceed $100,000." 10 U.S.C. § 2306a(a)(1)(D)(i). Allison and GTC did not violate TINA because (1) they had only preliminary plans to negotiate a lower price for the Gen-Sets and had not actually reached an agreement to lower the price by November 1993 – the time Allison and Bath reached their agreement; and (2) they had no duty to disclose their agreement that did lower the price because it was made thirteen months after November 1993. As we find that

Allison and GTC did not withhold any "cost or pricing data" from Bath during the contract negotiations, we need not consider whether the $100,000 threshold was met in this case.

"Cost or pricing data" under TINA includes "all facts that, as of the date of agreement on the price of a contract (or the price of a contract modification), . . . a prudent buyer or seller would reasonably expect to affect price negotiations significantly." 10 U.S.C. § 2306a(h)(1). Judgments need not be disclosed, but a party must make available "all factual information on which a judgment was derived." *Id.* Thus, any factual information known to Allison prior to November 23, 1993, that "a prudent buyer or seller would reasonably expect to affect price negotiations significantly" should have been disclosed to Bath.

Relators argue that Allison had a duty to disclose the "fact" that it had an "agreement to negotiate a price reduction" with GTC prior to November 1993. If such an agreement had existed, it would likely be a "fact" that one "would reasonably expect to affect price negotiations significantly." The evidence to support this purported agreement, however, is lacking. Two of the documents put forth by relators do not even insinuate that a price reduction will occur, much less prove that an agreement to negotiate one has been reached. The first, a letter from GTC to Allison on July 31, 1992, states only that GTC anticipates no increase in cost from the redesign. The second, an Allison memo dated May 4, 1993, deals primarily with GTC's acceptance of the no-cost modification and that the AG9140 will have "less material cost" than the AG9130. These documents do not discuss price or the Allison-GTC agreement in any way.

Relators also rely on the December 1992 memo, the EPA Form and the June 1993 Purchase Order Amendment. These documents give some indication that a price reduction will occur but offer no evidence that an agreement has been reached to do so. The December 1992 memo states only that "[o]ur long term *strategy* is to reduce the cost of the generator set" before providing one estimate of how costs could be reduced. Both the EPA Form and the June 1993 Purchase Order Amendment state that a price reduction is "anticipated" but that such a reduction is "subject to negotiation." None of these documents gives any indication that an agreement has been reached with GTC to negotiate any price change, much less a lower price.[9] Relators have put forth no document from GTC stating that the company agreed to renegotiate or agreed to lower its price. Rather, these documents appear to represent Allison's unilateral belief that it should pay a lower price for GTC's services going forward.

Allison did not have a duty to relay its expectation or hope that it would have lower costs to Bath during the contract negotiations. The only thing that Allison knew as a fact prior to November 1993 was that it *wanted* to negotiate a lower price. There is no evidence that GTC would even agree to such a renegotiation or how much Allison could save in the renegotiation. The two sides did not begin negotiations until the first Gen-Sets had been constructed, a year after the contract with Bath had been finalized. At this point, Allison had no duty to disclose under TINA because the negotiations with Bath were complete and a "price adjustment" was not "expected."

The cases cited by relators do not alter our analysis. In *Aerojet Solid Propulsion Co. v. White*, 291 F.3d 1328 (Fed. Cir. 2002), the contractor failed to disclose to the Air Force that it had solicited sealed bids from a potential supplier during the final stages of the two parties' price negotiations. Aerojet argued that possession of the bids was not "cost or pricing data" because it had not opened the sealed bids and thus did not know the amounts of the bids. The court rejected this argument, ruling that "cost or pricing data is not any less cost and pricing data because it has been selectively

---

[9]Relators refer to the June 1993 Purchase Order Amendment as a "contract amendment," but there is no indication that this is any more than a reaffirmation that GTC should deliver AG9140's rather than AG9130's.

disseminated or not actually used." *Id.* at 1332. Unlike the contractor in *Aerojet*, Allison did not have concrete information in its possession during its negotiations with Bath. Allison did not choose to keep itself ignorant from new cost data; it had no new data. Allison had only a hope that the price it paid GTC would decrease. In *Cutler-Hammer, Inc. v. United States*, 416 F.2d 1306 (Ct. Cl. 1969), the court found a TINA violation because the contractor knew the exact amount of the lower bid, and the court found there was a "definite possibility" that such a bid would be accepted. *Id.* at 1314. Again, however, Allison did not possess such definite information. Finally, the court in *United States ex rel. Campbell v. Lockheed Martin Corp.*, 282 F. Supp. 2d 1324 (M.D. Fla. 2003), ruled that preliminary findings made by a contractor must be reported because they are still findings and could influence the outcome of the negotiations. *Id.* at 1334-35. No findings, preliminary or otherwise, existed in the present case. Allison merely speculated that it would be able to lower costs, and we will not extend TINA to require the disclosure of every cost projection or forecast memo.

A primary objective of TINA is to put the government and contractors on roughly equal footing during price negotiations. *See Aerojet*, 291 F.3d at 1330 (citing *Unisys Corp. v. United States*, 888 F.2d 841, 844 (Fed. Cir. 1989)). Allison's failure to disclose its plan to lower its own costs did not put the government at an unfair disadvantage in the negotiations because the plan has not been shown to be anything more than pure speculation as of November 1993. As relators have put forth no additional evidence of any "cost or pricing data" possessed by Allison that was not furnished to Bath or the government, summary judgment is appropriate.

III.

The decision of the district court in the Quality Case is REVERSED and the case is REMANDED for proceedings not inconsistent with this opinion. The decision of the district court in the Pricing Case is AFFIRMED.

_____

**CONCURRING IN PART, DISSENTING IN PART**
_____

ALICE M. BATCHELDER, Circuit Judge, Concurring in part and Dissenting in part. I respectfully dissent from that portion of the majority opinion reversing the district court's judgment in favor of the defendants in the "Quality Case." I cannot agree with the majority's interpretation of 31 U.S.C. § 3729(a)(2), which states in pertinent part: "Any person who . . . knowingly makes, uses or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government . . . ." The majority asserts that "There is nothing in this language to suggest that the claim must be shown to have been presented to the government, so long as it can be shown that the claim was paid with government funds." I would read the term "[a] claim paid or approved by the Government" as creating a causal connection between the claim and the payment. Payment of a claim "by the Government" presupposes that the claim has been presented to the government as a request for that payment. The term "by the Government" is not the same as "with government funds." The former connotes action; the latter mere association.

Consider a case in which the government contracts for a specific project with a prime contractor, which in turn contracts with a sub-contractor. In the ordinary course, the government pays the prime contractor in response to the bills submitted by the prime contractor. Those bills will include the bills submitted to the prime by the sub-contractor. So when a sub-contractor submits a false statement to the prime contractor, it is using that false statement to get its fraudulent claim paid by the government, albeit through the prime contractor. And the prime contractor is not merely paying the sub with government funds; rather, the prime contractor uses the sub's claim to induce the government to pay the prime contractor's bill, which includes the false claim. Critically, the government determines whether to approve or deny the payment, or to provide or withhold the funds. Alternatively, suppose the prime contractor has been bankrolled by the government and given full authority to pay claims without resort to government approval. The subcontractor's claim is actually paid "by the prime contractor," albeit with government funds. But, in bankrolling the prime contractor, the government did not act in response to the claim. The government may not even know that the subcontractor made a claim. The subcontractor's false statement did not induce the government to do anything. For purposes of inducing a response, presentment of the claim to the government is necessary to initiate a causal relationship that is completed with an act (payment or approval) "by the Government."

This distinction was explained - correctly, in my view - in *Totten v. Bombardier Corporation*, 380 F.3d 488, 497-502 (D.C. Cir. 2004). In *Totten*, the claimant submitted the false claim to Amtrak, a non-governmental entity. *Id.* at 498-99. Amtrak was not an intermediary - - Amtrak was bankrolled by the government, but had autonomy to pay whatever claims it liked without government involvement or approval. The *Totten* majority explained that, even though Amtrak had federal funds to spend, Amtrak's independence meant that the claim was paid by Amtrak, not "by the Government." *Id.* at 502. The "government funds" nexus is too broad to survive the limiting language of "by the Government." *See id.* at 496 (warning that such a "boundless" interpretation would include almost every college and university, due to federal grants).

As the above example should make evident, I also disagree with the majority's statement that "reading presentment into (a)(2) would give it almost the same meaning as section (a)(1), rendering the latter largely superfluous." Section (a)(1) addresses false claims presented directly to the government, while Section (a)(2) addresses false claims submitted through a messenger, despite a lack of scienter on the part of the messenger. Section (a)(3) addresses conspiracy, but I believe the

previous analysis would apply as well to its particular language, which also creates an implicit causal connection between the claim and the government payment.

Finally, I disagree with the majority's proposition that, under Section (a)(2), "the claim must have actually been paid." To begin with, the plain language of Section (a)(2) applies to one who "knowingly mak*es*, us*es* or caus*es* to be made or used, a false record or statement." All of those verbs are in the present tense. Section (a)(2)'s infinitive phrase "to get a . . . claim paid" is simply an adverbial phrase modifying those verbs. That phrase explains the motive or reason for the making, using, or causing, and an ordinary reading of this language reasonably encompasses even an *attempt* to get a claim paid. The majority cites no authority to support the proposition that this section requires that the claim has already been paid or that mere submission of a false claim is insufficient, and in fact cites authority to the contrary. *See*, *e.g.*, *Rex Trailer Co. v. United States*, 350 U.S. 148, 153 & n.5 (1956); *United States v. Rivera*, 55 F.3d 703, 709 (1st Cir. 1995) ("Indeed, a contractor who submits a false claim for payment may still be liable under the FCA for statutory penalties, even if it did not actually induce the government to pay out funds or to suffer any loss.").

I would find the present case subject to the *Totten* distinction discussed above. If payment of the fraudulent claim was made by the shipyards (i.e., prime contractors) rather than "by the Government," then Section (a)(2) imposes no liability. *See Totten*, 380 F.3d at 502; 31 U.S.C. § 3729(a)(2). As the district court found, and the majority quotes in footnote 3, the plaintiffs not only failed but actually refused to produce any evidence that any claim was presented by the shipyards to the government for payment. Without evidence that the government was ever requested to pay the claim, there is no basis to conclude that the government actually decided the claim one way or the other, or ever approved payment. As with Amtrak, payment by the shipyard, even using government funds, is not the same as payment "by the Government." Therefore, I must also disagree with the majority's conclusion in footnote 5. I would find that the plaintiffs failed to prove the causal connection necessary to demonstrate their prima facie case, and affirm the district court's grant of judgment as a matter of law.

I concur in the remainder of the opinion.